**Franklin Norman SCHENK, Petitioner,**

v.

**Ed ELLSWORTH, Jr., Respondent.**

**No. 1664.**

United States District Court
D. Montana,
Butte Division.

Nov. 6, 1968.

David O. DeGrandpre, Helena, Mont., for Franklin Norman Schenk.

Forrest H. Anderson, Atty. Gen., of the State of Montana, and Wm. A. McCormick, Asst. Atty. Gen., Helena, Mont., for Ed Ellsworth, Jr.

### MEMORANDUM AND ORDER

MURRAY, Senior District Judge.

Petitioner Schenk seeks a writ of habeas corpus and release from imprisonment in the Montana State Penitentiary wherein he was confined following conviction by jury verdict of second degree murder in the District Court of the Ninth Judicial District of the State of Montana, in and for the County of Toole, on March 7, 1967. He was sentenced by the court on March 17, 1967, to serve a prison term of twenty-seven years. The Montana Supreme Court affirmed the conviction and judgment on August 19, 1968.

Schenk alleges four specific denials of due process of law under the fifth, sixth and fourteenth amendments of the Constitution of the United States. They are in order of allegation: (1) the refusal of the court to allow discovery of evidence in the hands of the prosecution; (2) untimely appointment of counsel; (3) invalid waiver of counsel prior to giving a custodial pre-trial statement; and (4) the voir dire of three jurors out of the presence of the defendant.

The court finds merit in the third alleged denial.

It appears from the record that on the afternoon of November 24, 1966, petitioner Schenk, his wife, and her three children by a former marriage ate the traditional Thanksgiving dinner at the home of a neighbor couple in Shelby, Montana. Liquor was present in the form of two six-packs of beer and one half gallon and one fifth of red currant wine. This amount was consumed by Schenk and the two neighbors. Schenk's wife drank only half a beer and a sip of wine. At about 7:00 P.M. Mrs. Schenk returned home and Schenk and the neighbor couple proceeded downtown where Schenk consumed more beer at two separate bars until returning home sometime between 11:30 P.M. and midnight.

Schenk's wife died in their home shortly after midnight on November 25, 1966, as a result of a gunshot wound in the neck inflicted at point blank range. Dr. Beighle, who had been summoned by one of the Schenk children at Schenk's request, was the first to arrive at the scene at about 12:30 A.M. and he found Schenk lying on the bed next to the corpse. Schenk seemed emotionally very distraught, extremely upset and he appeared to have been drinking. Law enforcement officers arrived within minutes and took Schenk into custody. At about 1:15 A.M. Schenk was placed in the Toole County jail and booked on suspicion of murder.

About 12:30 P.M. on November 25, 1966, some twelve hours after the shooting, the Toole County Attorney entered Schenk's cell area and questioned him for approximately one hour. The sheriff was present during this time. The county attorney admitted on cross-examination at the pre-trial hearing on a motion to suppress that at the time of the questioning he suspected Schenk of having murdered his wife. At the outset of the questioning the county attorney told Schenk that he wanted to talk with him "in connection with the shooting incident of his wife." The county attorney went on to advise Schenk that he had the right to remain silent, anything he said could be used against him in court, he had a right to have a lawyer present at anytime and if he could not afford a lawyer one would be appointed for him. According to the county attorney, Schenk stated he "didn't think he needed an attorney at this time" and gave an oral statement.

Approximately half an hour after the first questioning period Schenk was taken to an interrogation room and questioned again by the county attorney. The sheriff was present and also a secretary who transcribed the questions

and answers on a typewriter. At the beginning of this session the county attorney advised Schenk of his right to remain silent, his right to have counsel, and that anything he said could be used against him in court and if he desired, counsel would be furnished him. Schenk stated he understood these rights.

Schenk was advised again for the typed record which the secretary was making. At this point Schenk asked the county attorney whether he thought he needed an attorney. The county attorney testified to this conversation at the pre-trial hearing on the motion to suppress as follows:

"Q. All right, he did ask you, 'Do you think I need an attorney?'

"A. Yes.

"Q. And what did you do then?

"A. I said, 'I feel that that is up to you'. I said that it would have to be his decision and that it was a serious matter, or words to that effect.

"Q. That was your response to his question, 'Do you think I need an attorney?'

"A. That's right."

The statement was then taken in question and answer form and reduced to writing which Schenk signed. This statement, though largely exculpatory, was introduced by the state at the trial and also used to impeach Schenk on the witness stand.

Schenk was never advised that he was suspected of having murdered his wife. He was not advised that he had been booked on suspicion of murder. He was only told by the county attorney that he wanted to talk with him "in connection with the shooting incident of his wife." Petitioner's first official notice of the reason for his detention came on Monday, November 28, 1966, when he was served with a warrant and a complaint charging him with murder in the first degree. He was then taken before a Justice of the Peace and waived preliminary examination. It is significant that after leaving the Justice of the Peace's office Schenk immediately asked the deputy sheriff's permission to use the phone and placed a call to Mr. John Bayuk, an attorney in Shelby, Montana.

■ The fact that Schenk asked the county attorney, during the second interrogation, whether he thought he needed an attorney casts extreme doubt as to Schenk's understanding of the circumstances of his detention and interrogation. The county attorney's reply was not only unresponsive for a lawyer and an officer of the court, but also misleading. That this was a "serious matter" does not give the accused the information he seeks and needs in order to knowingly and intelligently make a decision as to the waiving of his constitutional rights. Had Schenk been told at the outset that he was suspected of murdering his wife he would have been able to intelligently determine for himself whether he wanted to make a statement or whether he wanted a lawyer present. Witness the fact that he called an attorney immediately after being informed of the charge by the Justice of the Peace. As matters stood, Schenk was very likely misled, wittingly or unwittingly, by the county attorney in regard to why he was being detained and questioned.

■ The major thrust of the Supreme Court's opinion in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694, 10 A.L.R.3d 974 (1966), is to preserve for a person in custody the right to freely exercise the privilege against self-incrimination and the right to counsel if he so chooses. The procedural rules laid down by the court are designed to counterbalance the inherent unfairness of the jailhouse interrogation. As the court stated in Miranda v. Arizona, supra, at 475, 86 S.Ct. at 1628:

"A heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel."

 Since Schenk was not advised as to the reason for his detention and questioning, we hold that his waiver of the right to counsel was not made knowingly and intelligently. We are not establishing a requirement that a suspect be advised with technical precision what formal charge or charges are contemplated. We are saying that when a person is in custody and, for all practical purposes, charged with a crime, Escobedo v. Illinois, 378 U.S. 478, 486, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), then he must be told of the crime he is suspected of having committed before a statement can be taken. Certainly it stands to reason that a suspect cannot intelligently make the decision as to whether he wants counsel if knowledge of the crime suspected is withheld from him. This knowledge is a necessity for the free exercise of the right to counsel.

It is of no significance that Schenk's statement is largely exculpatory. As the Supreme Court said in Miranda v. Arizona, supra, at 477, 86 S.Ct. at 1629:

> "No distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory.' If a statement made were in fact truly exculpatory, it would, of course, never be used by the prosecution. In fact, statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and to prove guilt by implication. These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement."

 Because "assessments of the knowledge the defendant possessed, based on information as to his age, education, intelligence, or prior contact with authorities, can never be more than speculation," Miranda v. Arizona, supra, at 468–469, 86 S.Ct. at 1625, we hold that the sixth amendment right to counsel could not in this case be knowingly and intelligently waived unless the defendant is made aware of the fact that he is under arrest and booked, and for all practical purposes charged with murder.

Therefore, the court finds that Schenk's waiver of the right to counsel was ineffective. As a result his statement was improperly introduced at the trial.

The court finds no merit in the first, second and fourth allegations of the petition.

Therefore, it is ordered and this does order that the said defendant be discharged from the custody of the Warden of the Montana State Prison unless within 20 days from the date of this order a new trial has been ordered for petitioner.