COMMONWEALTH vs. DAVID A. TATRO.

Hampshire.    January 12, 1976. — May 13, 1976.

Present: HALE, C.J., GOODMAN, & GRANT, JJ.

*Homicide. Robbery. Joint Enterprise. Evidence,* Of state of mind,
Unresponsive answer, Admissions and confessions, Prior consistent
statement. *Constitutional Law,* Waiver of constitutional rights, Ad-
missions and confessions. *Waiver. Practice, Criminal,* Mistrial,
Sentence.

At the trial of one of a group for armed robbery of a store in an eve-
ning, evidence that the defendant and two others of the group had
discussed robbing another place that morning was admissible to show
the state of mind of the group to carry out a robbery. [297]
An exception in a criminal case to denial of a motion for a mistrial by
reason of an unresponsive answer by a witness that the defendant
had previously been in trouble with the police was without merit in
view of an instruction to the jury by the judge to disregard such
answer. [297-298]
In a case where the defendant was convicted of armed robbery and
manslaughter of the victim, a conclusion that there had been a valid
waiver of the defendant's constitutional rights respecting a statement
given by him to a police officer was, on facts found by the trial
judge, not precluded by physical abuse of the defendant by other
police officers some five hours before he gave the statement, or by
the circumstance that he had not been informed by the police of
the victim's death when he gave the statement, or on the ground that
the statement was a product of an earlier statement to other police
officers which was suppressed by the judge. [298-304]
On the record of a criminal trial, no abuse of discretion appeared in
excluding, on redirect examination of a witness for the defendant,
an affidavit by the witness offered as a prior consistent statement by
him. [304-305]
In a case where the defendant was convicted of armed robbery and
manslaughter of the victim, there was no error in admission of an
opinion by a qualified witness that the victim's death was caused by
fright resulting from the robbery. [305]
Evidence that the defendant in a criminal case participated as one of a
group in a joint enterprise of armed robbery of a store, although he
remained in an automobile outside the store, and that the proprietor
of the store died of fright caused by the robbery warranted convic-
tions of the defendant of armed robbery and manslaughter. [305-
306]
Upon conviction of a defendant of armed robbery and manslaughter of
the victim under separate indictments, there was no error in sen-
tencing the defendant to consecutive terms for the two crimes. [306]

INDICTMENTS found and returned in the Superior Court on February 20, 1973.

The cases were tried before *Moriarty,* J.

*Conrad W. Fisher* for the defendant.

*Stephen R. Kaplan,* Assistant District Attorney, for the Commonwealth.

HALE, C.J.    The defendant was convicted of manslaughter, armed robbery, and assault by means of a dangerous weapon after a trial in the Superior Court pursuant to G. L. c. 278, §§ 33A-33G.

Evidence was introduced from which the jury could have found that the defendant was one of a group of five young men who robbed the Venus Medical Center in Ware. The defendant and two of the others met on the morning of February 7, 1973, in Warren and agreed to break into the Warren town hall that night to steal money. The defendant and three others met again at 6:30 that night, drove to Ware, and purchased and consumed a case of beer. They stopped by the defendant's home, where the defendant borrowed $5 from his mother. At 10:30 P.M. they picked up the fifth member of the group. While driving around, the group changed its plan and decided to hold up the Venus Medical Center for money and beer. They parked down the street from the store, and three of them walked toward it while the defendant and another remained in the front seat of the car, the defendant on the right. One of the three carried a shotgun as he left the car but put it by a fence while the other two entered the store. They encountered the proprietor, one Milos, picked out a number of items, and put them on the counter. Milos asked them to pay for their purchases and leave. One of them returned to the car to get some money. The defendant gave it to him, and he returned to the store, followed by the man who had been waiting outside and now was carrying the gun. Frightened by the gun, Milos ran into his adjoining residence, shut the door, and yelled, "Shotgun, holdup, call the police." He began to vomit and fell to the floor unconscious. Medical assistance was called. Milos

was pronounced dead on arrival at a local hospital fifteen minutes later.

The police arrived on the scene shortly after 11:25 P.M. and blocked the street on which the defendant and his friends sought to escape in their car. As one of the policemen drove up he observed the occupant of the front passenger's seat open the rear door to assist one of the group who had been in the store. Four of the group were arrested immediately, but the fifth escaped and was arrested at a later time. Further facts will be described as needed in the discussion of the assignments of error.

We have examined the defendant's assignments of error, find that none of them requires reversal, and affirm the convictions for the reasons set out below.

1. The defendant contends that the jury list mandated by G. L. c. 234, § 4, failed to include information as to the marital status and the occupations of the spouses of some of the jurors. He argues that the judge erred in refusing to question the jurors to elicit such information. No findings were made about the completeness of the list, and the list has not been incorporated in the record before us. We, therefore, have no means of determining the truth of the defendant's allegations. The burden of demonstrating error is on the appellant. *H. E. Fletcher Co.* v. *Commonwealth*, 350 Mass. 316, 322-323 (1966).

2. The defendant next contends that it was error for the judge to have allowed two of the other members of the group to testify that they had discussed the possibility of robbing the Warren town hall on the morning of the day of the robbery of the Venus Medical Center. He argues that that testimony was improperly admitted because it described plans for a separate crime. The testimony was relevant, however, to demonstrate the state of mind of the group, showing a common plan to carry out a robbery, although the target later changed from the Warren town hall to the Venus Medical Center. *Commonwealth* v. *Fiore*, 364 Mass. 819, 824 (1974). *Commonwealth* v. *Mangula*, 2 Mass. App. Ct. 785, 791-792 (1975).

3. When a witness testified that the defendant had been

in trouble with the police before, the defendant's counsel moved for a mistrial and excepted to the denial of it. The judge acted as if there had been a motion to strike, instructing the jury that the answer was unresponsive to the question and was to be disregarded. His actions were entirely proper. *Commonwealth* v. *Early,* 349 Mass. 636, 637 (1965).

4. The defendant contends that the judge improperly admitted testimony by Detective Lieutenant Powers of the State Police concerning a statement made by the defendant. He argues that he could not have voluntarily waived his rights to remain silent and to obtain counsel in light of physical abuse he suffered at the hands of the local police and the failure of Lieutenant Powers to inform him of the death of Milos.

The judge conducted a voir dire and, pursuant to an order of this court, has made extensive subsidiary findings and rulings of law with regard to the voluntariness of the waiver of rights and of the statement given to Lieutenant Powers. See *Commonwealth* v. *Hosey,* 368 Mass. 571, 574-575, n.1 (1975). "We accept, as we must, the trial judge's resolution of conflicting testimony ... and will not disturb his subsidiary findings if they are warranted by the evidence ... However, ultimate findings and conclusions of law, particularly those of constitutional dimensions, are open for our independent review ...." *Commonwealth* v. *Mahnke,* 368 Mass. 662, 666-667 (1975).

We summarize the judge's findings and conclusions. The four suspects, arrested immediately after the arrival of the police, were taken to the police station. There, at around midnight, they suffered physical abuse. One, Perkins, was slapped across the face when he was asked the name of the boy who had run away and replied that he did not know. At about the same time, the defendant was choked and pushed around, again in an attempt to discover the whereabouts of the escapee.

Sergeant Mettig of the Ware police department, who was not aware that any abuse had been inflicted on any of the suspects, escorted them to their cells, informed

them of their right to use the telephone, and left the station to pursue the fifth suspect. When he returned with that person he interviewed each of the suspects in the presence of Officer Gagnon. He spoke to the defendant at about 12:40 A.M. Sergeant Mettig read the *Miranda* warnings and asked the defendant whether he understood them, to which the defendant replied that he did. The defendant gave vague answers to the questions, and his statement was exculpatory except for admitting his presence in the car.[1]

The judge held that the Commonwealth had failed to sustain its burden of demonstrating that the defendant voluntarily, knowingly and intelligently waived his rights to silence and to the assistance of counsel before making the statement, and suppressed it. The judge found, however, that the statement was not the product of the physical abuse which the defendant had suffered earlier. During the first interrogation of the defendant, Sergeant Mettig was not aware that the defendant had been abused, nor was he aware of the death of Milos.

Detective Lieutenant Powers, assigned to the office of the District Attorney for the Northwestern District, was called shortly after 1:00 A.M. on February 8, 1973, and arrived at the scene of the crime shortly after 2:00 A.M. to begin his investigation. He questioned all of the suspects. His questioning of the defendant took place shortly after 5:00 A.M. in the presence of Corporal Malatesta of the State police and Sergeant Mettig. The judge found that Lieutenant Powers clearly and adequately advised the defendant of his constitutional rights. Powers then gave the

---

[1] "I David Tetrault [*sic*] allege that I met Joe Perkins in Warren about 8 P.M. I got in his car, at that time Al LaBare & Danny Columbe [*sic*] were in car. The four of us came to Ware about 10 PM we also had Bud Duvall [*sic*] in car with us when we came to Ware. Tetrault [*sic*] claims he went with the rest of the guys to Venus. He didn't get out of car when Columbe [*sic*], LaBare, Duvall [*sic*] went into Venus. He alleges he didn't see gun (rifle) until Duvall [*sic*] threw gun in car. One of the three who went into Venus said as they were getting into back seat let's get out of here.

Sgt. Stanley G. Mettig, Jr.
Henry Gagnon"

defendant a paper on which were printed the *Miranda*
warnings and a form of waiver of those rights. The de-
fendant was asked to read the paper and did so. He stated
that he understood his rights and then, at the request of
Lieutenant Powers, signed the paper. The defendant was
sober at that time and made no mention of any verbal or
physical abuse by the Ware police to Lieutenant Powers.
Whatever marks the defendant had on his neck earlier
in the night were not "sufficiently pronounced at the time
of the interview to attract the attention of Lieutenant
Powers." Again, the defendant made a statement which
was largely exculpatory.[2] He claimed not to have known
that the shotgun was in the car or that the others intended
to rob the store until after the robbery was completed.

Although Lieutenant Powers had learned of the death
of Milos earlier in the evening, he did not inform the de-
fendant of that fact during the interview. The defendant
knew he was charged with armed robbery. The judge
found, "At the time of the interview the cause of Milos'

___

[2] "He stated [to me] he met Joe Perkins in Warren about eight
o'clock, when he was hitchhiking. He said he went to school with him.
The other four guys were in the car, and he knew them all except
Duval. They picked him up. He said he had two or three beers. He
said they came to Ware and they picked up Ricky Tetreault [*sic*] and
drove him to West Warren. He stated that he was driving at this time
because Joe wasn't feeling too good. When they got to West Warren,
then Joe took the wheel. He stated that he was in the front, and the
other three were in the back.

"He said they went to Duval's house and Duval went in. He stated
he got out of the car, he and Joe Perkins, and took a piss. He stated
that when he got back in the car, Duval was already in the back. He
stated that he did not see any gun; in fact he didn't know they had a
gun until they came out of Venus' and threw it into the car, and the
barrel almost hit him in the back of the neck. He stated he did not
know they were going to stick up the store.

"He stated he gave some money to Danny — a five dollar bill — be-
fore he went into the store. He stated that money was for buying beer.
He stated that he and Joe stayed in the car with the motor running. He
stated that he should have known something was up, because Duval
came back and asked for a swig of his beer after Duval got out of the
car to go into the store. He stated that they came running out and
jumped in and said, 'Let's go.' He stated that Joe started up, and Al
LaBare was half in and half out. He stated they didn't get very far,
the police arrested them."

death had not yet been determined — but Lieutenant Powers was aware that there was no evidence that the victim had been shot or struck in the course of the robbery. It was, at that time, by no means clear that the defendant would be charged with any form of homicide."

The judge did not believe the representations made in the defendant's behalf that he would not have waived his rights and given the statements if he had been informed of Milos' death.[3]

On the basis of his subsidiary findings, the judge concluded that neither the physical abuse nor the lack of knowledge of Milos' death affected the adequacy of the defendant's waiver of his rights before giving the statement to Lieutenant Powers.[4]

---

[3] "I believe that the defendant's purpose in giving the statement was to convince Lt. Powers that he was an innocent bystander and not a participant in the robbery. His statement was carefully contrived to create that impression [footnote omitted]. I do not believe that the additional knowledge of the death of Milos would have deterred the defendant from his attempt to establish his innocence."

[4] The judge's findings and conclusions were: "(a) The defendant was not informed of the death of Venetius Milos before he gave his statement to Lt. Powers.

"(b) The failure of the police to inform the defendant of the death of the victim was not intended by the police to deceive or trick the defendant.

"(c) The defendant's lack of knowledge of Milos' death did not affect his decision to waive counsel and talk to Lt. Powers.

"(d) The interrogation of the defendant by Lt. Powers was directed to the question of determining his criminal responsibility for the armed robbery of Milos. At that time it was not certain that any of the suspects would be charged with criminal responsibility for the death of Milos, since the cause of that death had not yet been determined. The possibility did exist, however, that all participants in the robbery would be charged as principals with criminal responsibility for the death of Milos in the event it was determined that the robbery had been the cause of that death — and Lt. Powers was aware of that possibility.

"(e) The defendant did suffer some physical abuse at the hands of the Ware police after Sgt. Mettig left the police station and before he returned after the arrest of Duval. The abuse consisted of choking the defendant in an effort to force him to divulge the identity of Duval, the only occupant of the car who had succeeded in escaping from the police at the scene of the crime. While that abuse was inexcusable and not to be condoned, it did not result in any serious injury to the defendant.

"(f) The statement given to Lt. Powers was, I am convinced, suf-

Our independent review of those subsidiary facts leads us to the same ultimate conclusions as those reached by the judge. We consider first the effect of the physical abuse on the statement given to Lieutenant Powers. We must determine whether under the totality of the circumstances "the defendant's confession was a free and voluntary act and was not the product of inquisitorial activity which had overborne his will." *Commonwealth* v. *Mahnke,* 368 Mass. at 680. We find adequate support in the judge's subsidiary findings to determine (as we do) that there was a sufficient "break in the events" between the time of the physical abuse and the statement to Lieutenant Powers to free the statement of any effect of the physical abuse. *Id.* at 683-686. We further find that the defendant had not "let the cat-out-of-the-bag." *Id.* at 686-687.

After the physical abuse, the defendant was placed in

ficiently independent of the effect of the abuse inflicted by the Ware police so as to be purged of any resulting taint. A period of nearly five hours had elapsed between the time when the abuse was inflicted and the time when the statement was given. The purpose of the abuse had been to obtain information as to the identity of Duval and not to obtain an admission or confession from the defendant — and Duval had been in custody for nearly four hours by the time the defendant spoke to Lt. Powers. The interrogation was conducted in a calm setting, by a high-ranking officer of the Massachusetts State Police, and without the presence of the local police officers who had abused the defendant earlier in the evening. Although the defendant had made no effort to do so, he had been afforded an opportunity to reach his family or an attorney by telephone. I feel confident that the choking of the defendant by a local police officer shortly after his arrest was in no way a factor in the production of the statement made to Lt. Powers at sometime after 5 A.M.

"I am also confident that the statement given to Lt. Powers was not the product (under the 'cat-out-of-the-bag' type of analysis discussed in *Commonwealth* v. *Mahnke,* [368 Mass. 662]) of the earlier statement given to the Ware police. Neither statement constituted a confession and neither contained any damaging admissions. Both statements were exculpatory and intended to establish innocence rather than guilt. The second statement was more detailed and lucid than, but was not inconsistent with, the first. By the time it was given the defendant had had an additional four to five hours to reflect upon his position and to develop possible explanations to buttress weaknesses in his version of the incident — but his second statement was not prompted by a sense of futility as a result of having let any 'cat-out-of-the-bag' earlier in the evening."

Commonwealth *v.* Tatro.

a cell at the police station. He was informed of his rights to make a telephone call and to remain silent. At the time of the abuse there was no attempt to obtain a statement. The defendant was first questioned by Sergeant Mettig and later by Lieutenant Powers, who was accompanied by Sergeant Mettig and Corporal Malatesta. None of those men had participated in or had been present during the physical abuse. A significant period of time had passed between the physical abuse and the making of the statement admitted in evidence. The defendant had had an opportunity to seek the assistance of counsel or the help of family or friends. See *Commonwealth* v. *Mahnke*, 368 Mass. at 708-709 (Kaplan, J., dissenting).

We thus do not rely only on the fact that Lieutenant Powers restated the *Miranda* warnings to the defendant and obtained his waiver. Rather, we consider that the totality of the circumstances sufficiently demonstrated the voluntariness of the waiver of rights and of the statement so that any remaining taint of the physical abuse was purged. See *Brown* v. *Illinois*, 422 U. S. 590, 602 (1975).

We also agree with the judge's conclusion that the failure to inform the defendant of the death of Milos did not prevent him from voluntarily waiving his rights to remain silent and to seek the assistance of counsel. As it was determined in this case that the failure to inform by the police was not intended to trick or deceive the defendant, the lack of knowledge about the victim's death need only be considered as one factor in the totality of the circumstances assessed to determine voluntariness. *Collins* v. *Brierly*, 492 F. 2d 735, 738 (3d Cir.), cert. den. 419 U. S. 877 (1974). See *People* v. *Smith*, 108 Ill. App. 2d 172 (1969), cert. den. 397 U. S. 1001 (1970); habeas corpus den. sub nom. *United States ex rel. Smith* v. *Fogel*, 403 F. Supp. 104 (N. D. Ill. 1975).[5] The judge's conclusion

---

[5] No Massachusetts cases have turned on the effect of a failure to inform a defendant of the death of a victim of a crime on the voluntariness of his waiver of rights. Cases in other jurisdictions range from those that treat even intentional deception as to the victim's survival (without other threats or inducements) as not affecting the admissibil-

that the failure to inform did not result from intentional deception or trickery appears to be correct. At the time of the interview with Lieutenant Powers, no autopsy had been performed on Milos, and the cause of death was not certain. The trial judge found that "[i]t simply did not occur to Lt. Powers at that time that such advice was necessary or appropriate under the circumstances that existed." No homicide charges were then contemplated. Although Lieutenant Powers "was aware of... [the] possibility" of such charges, the questioning was, to all intents and purposes, an investigation simply of an armed robbery.

The judge carefully considered the defendant's lack of knowledge of the death of the victim in assessing the voluntariness of his waiver of rights. In view of the judge's disbelief that the defendant would have behaved differently had he known of the death, and in view of the exculpatory nature of the statements, we find no reason to disagree with the conclusion that the lack of knowledge of the death did not affect the voluntariness of the waiver and statement.

5. The defendant contends that the judge erred in refusing to allow in evidence an affidavit of Alfred LaBare, a witness for the defendant, describing physical abuse by the Ware police, which had been submitted in support of a motion to suppress filed in separate proceedings in which LaBare had pleaded guilty to charges for his participation in the crime. On direct examination by the defendant's attorney, LaBare had testified to that abuse. On cross-examination the prosecuting attorney asked why he had failed to make any mention of physical abuse to the State police lieutenant. The witness responded that he did not remember whether he had made such a statement but that if he had been asked by the police, he would have told them about the physical abuse. On re-direct examination the defendant's attorney attempted to introduce the affi-

ity of statements, e.g., *People* v. *Pereira,* 26 N. Y. 2d 265, 268-269 (1970), to those stating that the failure to inform makes the waiver involuntary per se, e.g., *Schenk* v. *Ellsworth,* 293 F. Supp. 26 (D. Mont. 1968); *Commonwealth* v. *Collins,* 436 Pa. 114 (1969).

davit as a prior consistent statement. The judge excluded it, and the defendant excepted to that ruling. LaBare's answer that he did not remember making a statement to the police did not impeach his earlier statement. Even so, the determination of the admissibility of prior consistent statements for rehabilitation of a witness is largely within the discretion of the trial judge. *Commonwealth* v. *Tucker,* 189 Mass. 457, 485 (1905). *Boutillette* v. *Robbins,* 338 Mass. 195, 197-198 (1958). *Commonwealth* v. *Zukoski,* 370 Mass. 23, 26-27 (1976). The judge was not plainly wrong. The defendant had ample opportunity to rehabilitate the witness on recross-examination.

6. There was no error in the admission of the opinion of Dr. Katsas, a forensic pathologist, who had performed an autopsy on the victim's body, that the victim's death was caused by fright resulting from the armed robbery. The witness was qualified to testify to such an opinion. The possibility that there could have been other causes of the victim's death does not make his opinion inadmissible. Before giving his opinion Dr. Katsas had been asked to assume certain events as having occurred prior to the victim's death. In giving his opinion Dr. Katsas summarized the events by referring to them as an armed robbery. The defendant's objections to that opinion were in no way based on the doctor's use of the words "armed robbery." In fact, defense counsel used those very words himself in stating his objections to the court — "I would also submit, your Honor, that Dr. Katsas cannot give an opinion that the heart failure was caused by the armed robbery or the armed holdup."

7. There was no error in the denial of the motions for directed verdicts. The jury could have found that the defendant was a participant in a joint enterprise which included an armed robbery. As the armed robbery constituted wanton and wilful conduct, and as there was evidence from which the jury could conclude that the victim's death resulted from that conduct, there was sufficient evidence to support the manslaughter conviction. See *Commonwealth* v. *Atencio,* 345 Mass. 627, 629 (1963). In view

of the jury's acquittal of the defendant on so much of the indictment as charged murder, we need not consider whether there was error in the judge's refusal of the defendant's request to charge that "a death occasioned by grief or terror cannot in law be deemed murder."

8. No error was made in sentencing the defendant to consecutive terms for armed robbery and for manslaughter. The two indictments were for separate and distinct crimes, some elements of each requiring proof of different facts. See *Kuklis* v. *Commonwealth,* 361 Mass. 302, 306 (1972).

Other assignments of error which have not been argued are deemed waived.

*Judgments affirmed.*