STATE OF NORTH CAROLINA v. ANDREW THOMAS CARTER, SR.

No. 70

(Filed 4 January 1979)

**Constitutional Law § 35; Criminal Law § 75.10— waiver of rights—knowledge of charges not required for effective waiver**

*Miranda v. Arizona* does not require that a person being interrogated must be informed of the crime which he is suspected of having committed

before he can knowingly and intelligently waive his rights; rather, a defendant's awareness of the charges about which he is to be questioned is only one factor to be considered in assessing the validity of a waiver of rights.

Justice BROCK took no part in the consideration or decision of this case.

Justice EXUM dissenting.

APPEAL by defendant from *McKinnon, J.*, at the 23 January 1978 Criminal Session of DURHAM Superior Court.

Defendant was tried upon an indictment, proper in form, charging him with the murder of Irene Alley. A verdict of guilty of murder in the first degree was returned by the jury. Thereafter, the sentencing proceedings provided by G.S. 15A-2000 were held with the state and the defendant offering additional evidence before the same jury. After fourteen hours the foreman announced that the jury could not make a unanimous recommendation as to punishment. The court thereupon discharged the jury and entered judgment sentencing defendant to life imprisonment.

On 16 January 1978, prior to trial, defendant moved to suppress any statements made to the police by him on the ground that such statements were taken pursuant to a waiver of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966), but that the waiver was not knowingly and intelligently made. A *voir dire* hearing on the motion was conducted. On *voir dire* the evidence for the state tended to show:

While investigating the 24 September 1977 death of Irene Alley, a receipt book traced to defendant was found in the driveway of her residence on Stewart Drive. Pursuant to this lead, three plainclothes police officers went to defendant's place of employment on 26 September 1977 and asked him to accompany them to the police station for questioning. He voluntarily agreed to do so and was not formally arrested at that time.

Officers Sarvis and Roop, two of the officers who escorted defendant to the police station, testified at the *voir dire* hearing. Officer Sarvis testified that defendant was not informed of the purpose of the questioning and that no discussion of the investigation took place during the drive to the police station. Officer Roop testified that defendant was told that the police wanted to question him relative to an incident on Stewart Drive. He stated that

no threats or promises were made to defendant and that defendant was not informed that the investigation concerned a homicide until after he had signed a waiver of rights form. He further testified that at the beginning of the interrogation, defendant was told that the investigation concerned a break-in and homicide.

Investigator Simmons, who conducted the interrogation at the police station, testified that he initially asked defendant if he knew why the police wanted to question him and that defendant responded that he understood that the interrogation was about a break-in. Simmons stated that he learned that defendant had passed a high school equivalency examination and could read and write. He observed that defendant was not under the influence of drugs or alcohol and did not seem nervous at this time. He then testified as follows:

"Exhibit 1 is a Miranda Rights and waiver which we read to anybody who may be a possible suspect in a crime, and this is the form that I read to Mr. Carter on the day in question. I placed Mr. Carter's name and date and time on the form and found out that he had obtained a G.E.D. and could read and write. I then read the form as follows:

" 'Miranda rights and waiver: Before we ask you any questions, you must understand your rights. You have the right to remain silent; anything you say can be used against you in a court of law; you have the right to talk to a lawyer and have him present with you before you are questioned and during questioning. If you cannot afford a lawyer, one will be appointed to represent you before any questioning if you wish one. You have the right to stop answering questions at any time.'

"At the completion of this, I asked him whether he understood his rights and he acknowledged that he did. I asked him whether he had any questions in regard to what I had just read to him, and he replied that he did not. I then asked him to read along with me as I read the waiver of rights, and I read this to him as follows:

" 'This statement of my rights was read aloud to me and I have read this statement of my rights shown above. I understand each of my rights. Having these rights in mind, I

am willing to answer questions without talking to a lawyer. I do not want a lawyer present during this questioning. I understand what I am doing. No threats or promises have been made and no pressure of any kind has been used against me.'

"At the completion of this I asked the defendant whether he had any questions as to what I had just read to him anywhere on this form and he replied that he did not. I then asked him, 'Having these rights in mind, are you still willing to talk to me and answer some questions?' To which he replied, 'Yes.' I then asked him to sign the form and indicated with a check mark where to sign. He signed his name 'Andrew T. Carter, Sr.' and I checked the first box listed under departmental use only and signed my signature below. Exhibit No. 1 is the form that he signed in my presence. It has been in my custody and control since the time that he signed it."

After defendant signed the waiver form the interrogation, which lasted approximately two hours, began. During the interrogation defendant was not again advised of his rights. After about one hour of questioning, defendant was made aware that the investigation concerned a homicide. Approximately twenty minutes later he made a statement implicating himself in the strangulation of Irene Alley. Prior to being informed that the investigation concerned a homicide, defendant had indicated that he had been to the decedent's home in the course of his employment as an exterminator. Only after being informed that a homicide was involved did defendant show any signs of nervousness. Defendant did, however, willingly continue to answer the investigator's questions.

The defendant testified on direct examination on *voir dire* that he was picked up at work by three police officers. He stated that they told him that the investigation concerned a break-in and that they did not mention Stewart Drive; that he signed the statement waiving his rights which had been read by Investigator Simmons; that he was not informed until forty-five minutes to an hour after the questioning started that the investigation involved a homicide; and that he would not have waived his right to an attorney had he known that the investigation concerned a homicide.

On cross-examination defendant admitted that he understood the waiver when he read it and that he signed it voluntarily. He also testified that no threats or promises were made to him and that he had given his statement voluntarily. He added that he assumed that signing the waiver precluded him from later refusing to waive his rights.

On 26 January 1978 the court ruled that the statements made by defendant to the police were admissible. The facts found by the court are summarized as follows: Defendant voluntarily accompanied three police officers to the police station at approximately 5:00 p.m. on 26 September 1977. He told the police that he thought their investigation concerned a break-in and was not informed by them that the interrogation was concerned with a homicide. Defendant had his rights explained to him and understood those rights when he executed the waiver form. Defendant was informed that the investigation involved a homicide after approximately one hour of questioning and before he made the statement that he had put a belt around the neck of the victim. The statement of the defendant was made "voluntarily and without duress or coercion of any kind after he had been informed of his rights and had waived the presence of an attorney and had elected to make a statement." The defendant signed a written statement prepared by Investigator Simmons from the oral statements given him by defendant after he was made aware that the investigation concerned a homicide and after he had been fully advised of his rights and the nature of the charges against him. "[T]he failure of the officers to inform the defendant that an investigation related to a homicide at the time of warning him of his rights and before the execution of the waiver does not make the waiver of rights invalid or invalidate any statement made by the defendant and make it inadmissible in evidence."

At trial the uncontradicted evidence for the state tended to show that Irene Alley died from manual strangulation. A belt had been pulled tightly around her neck. The state also introduced the following statement of the defendant:

"Saturday morning, September 24, 1977, I got up out of bed at eight o'clock. Left home about 8:15-8:20 to go to work for Allied Exterminators, address 1419 Watts Street. I already had company truck. I serviced five accounts and

State v. Carter

went back to the office about 12:15. Left the office about
12:50. Went to 2913 Beechwood. Serviced them, left there ap-
proximately 1:30. Went to Bobby Smith's house, sat there
about a couple of hours drinking rum and Coke. Played a
hand of 'bid wiz' cards. There was a couple of other guys but
I didn't know what their name was. After we got through
playing cards we got on one of the fellow's car. It was a new
model car, green and white vinyl top piece, I believe. Went
and picked up another guy. Then we went to South Alston to
pick beans. I don't know how long we stayed out there pick-
ing beans. I was pretty well loaded. Between the four of us
we had drank about a fifth and a half of Bicardi's Rum. After
we left picking beans they took me back to get the company
truck. Told them I was going home. Put my tee shirt on. Got
in the truck, started it up, rolled it down the hill. Left there
and went to Mary Alston's on Bacon Street. I got another
drink of liquor. I stayed there about a half hour. Left there
and started home. I got to Hope Valley Road and Cornwallis.
Thought I would stop in and talk with Mrs. Alley, Stuart
Drive. Had been servicing her since June. Every time I went
there to service her we would sit down and talk about the
world situation. I had things on my chest that I had to talk
over with someone. Been trying to buy a house and my wife
was talking about going back to Roanoke Rapids or not.
Pulled up in the driveway behind Miss Alley's car. Knocked
on the side door. Mrs. Alley opened the door. She said, 'I
didn't think you were supposed to be back until next month.'
She opened the door and I went on it. I told her I wasn't sup-
pose to be back until next month for regular service. She
said, 'What do you want?' I said, 'I want to talk.' She said, 'I
ain't got time to talk to you, you drunk fool.' She hit me
across the shoulder with a yardstick in the kitchen dining
room area. She had the yardstick in her hand when she come
to the door. Well I hit her with my open hand. She said, 'You
will go to jail for his, you drunk fool,' and started screaming.
I tried to put my hand over her mouth to keep her from
screaming. She kept turning her head. I couldn't get my hand
across her mouth. So I put one hand around her neck, took
my belt off with the other hand. I put the belt around her
neck and pulled it tight. She started gagging and I got up
and left. It was about dusk dark. Near I can remember I

went straight home. Got home I went in the house. Put my shirt in the chair and went to bed. My wife come back about eleven o'clock. Told me if I wasn't going to watch wrestling to take my clothes off. Instead I got up and went to the kitchen, open a can of tomatoes, put them in the bowl, cut them up, put salt and pepper on the tomatoes got me two cold biscuits, sat down at the table and ate."

Defendant offered no evidence at trial. Defendant did testify at the post-verdict hearing to determine if he should receive the death sentence. At that time he gave testimony very similar to that contained in his pretrial statement.

*Attorney General Rufus L. Edmisten, by Assistant Attorney General James Peeler Smith, for the State.*

*R. Hayes Hofler III for defendant.*

BRITT, Justice.

Defendant has brought forward a single assignment of error. By it he contends that the court erroneously admitted into evidence statements made to the police by him during the course of custodial interrogation. He argues that one cannot knowingly, intelligently, and voluntarily waive his rights under *Miranda* when he has not been informed of the charges which the police are investigating.

Counsel for defendant has ably urged that we adopt the rule set forth in *Schenk v. Ellsworth*, 293 F. Supp. 26 (D. Mont. 1968). There the court held that a person being interrogated must be informed of the crime which he is suspected of having committed before he can knowingly and intelligently waive his right to counsel. As additional support for his position, defendant cites a line of cases from the state courts in Pennsylvania: *Commonwealth v. Dixon*, --- Pa. ---, 379 A. 2d 553 (1977); *Commonwealth v. Richman*, 458 Pa. 167, 320 A. 2d 351 (1974); *Commonwealth v. Collins*, 436 Pa. 114, 259 A. 2d 160 (1969). The Pennsylvania rule is that "the suspect need not have knowledge of the 'technicalities' of the criminal offense involved; rather, it is necessary only that he be aware of the 'transaction' involved." Dixon, *supra* at 556.

The approach to *Miranda* taken in the cases cited by defendant does not appear to have been followed in other jurisdictions, and we likewise refuse to follow this minority rule.

State v. Carter

*Miranda* does not explicitly require that a person in custody be informed of the charges which the police are investigating. In *Collins v. Brierly*, 492 F. 2d 735 (3rd Cir., 1974), *cert. denied*, 419 U.S. 877, 95 S.Ct. 140, 42 L.Ed. 2d 116 (1974), the defendant was the alleged driver of the getaway car used in a robbery perpetrated by him and three others. One of the four went into a lunchroom alone while the others waited in the car. The lone individual shot and killed the proprietor of the lunchroom. The others fled when they heard the shots. Later that same day, police went to defendant's home and asked him to accompany them to the police station for questioning. He agreed to do so voluntarily. At the station, prior to being told that the investigation concerned a homicide, defendant signed a waiver of rights form. He then made statements which implicated him in the robbery and ultimately in the homicide by virtue of the application of the felony-murder rule. At trial the defendant argued that his statements were not admissible as he had not knowingly, intelligently and voluntarily waived his rights under *Miranda*. In response to this argument the court said:

"We have serious reservations about an interpretation of *Miranda v. Arizona, supra,* which would require that before custodial interrogation begins, in addition to the mandated declarations, a statement must be made by the police as to the nature of the crime under investigation. That landmark decision was painstakingly specific in listing the basic constitutional rights which the police must propound to a suspect before he is questioned. Nowhere is there the slightest indication that there must be included a warning about the nature of the crime which has led to the interrogation conference, what the penalty is for the offense, what the elements of the offense consist of, and similar matters. That these might be requisites for the entry of a valid guilty plea in open court is not relevant to the standards applicable to the custodial interrogation stage of a prosecution. In a sense, all of these elements might conceivably enter into an 'intelligent and understanding' rejection of an offer for the assistance of counsel, but the simple answer is that *Miranda* does not by its terms go so far. It requires that the accused be advised of his rights so that he may make a rational decision, not necessarily the best one or one that would be reached

only after long and painstaking deliberation. Indeed, it may be argued forcefully that a choice by a defendant to forego the presence of counsel at a police interrogation is almost invariably an unintelligent course of action. It is not in the sense of shrewdness that *Miranda* speaks of 'intelligent' waiver but rather in the tenor that the individual must know of his available options before deciding what he thinks best suits his particular situation. In this context intelligence is not equated with wisdom. . . ."

A number of courts which have examined challenges to the validity of a waiver of *Miranda* rights where the defendant was not informed of the charges about which he was to be questioned prior to executing the purported waiver have reached the same result as that obtained in *Collins. United States v. Anderson*, 533 F. 2d 1210 (D.C. Cir., 1976); *United States v. Campbell*, 431 F. 2d 97 (9th Cir., 1970); *United States Ex Rel. Smith v. Fogel*, 403 F. Supp. 104 (N.D. Ill., 1975); *State v. Allen*, 111 Ariz. 546, 535 P. 2d 3 (1975); *James v. State*, 230 Ga. 29, 195 S.E. 2d 448 (1973); *State v. Russell*, 261 N.W. 2d 490 (Iowa, 1978); *State v. Clough*, 147 N.W. 2d 847, 259 Ia., 1351 (1967); *Commonwealth v. Griswold*, 358 N.E. 2d 482 (Mass. App., 1977); *Commonwealth v. Tatro*, 346 N.E. 2d 724 (Mass. App., 1976); *Commonwealth v. Roy*, 307 N.E. 2d 851, 2 Mass. App. 14 (1974); *People v. MacDonald*, 403 N.Y.S. 2d 337 (1978); *cf., United States v. Hall*, 396 F. 2d 841 (4th Cir., 1968) (informing defendant of possible punishment prior to waiver of rights is not essential to make waiver knowing and intelligent).

We believe that *Miranda* not only lacks an explicit requirement that an individual be informed of the charges about which he is to be questioned prior to waiving his rights but also lacks any implicit requirement that such action be taken by authorities before a valid waiver of rights can be executed by one who is to be interrogated. *Miranda* "reflects the Supreme Court's concern that an accused might, to his detriment, forfeit rights afforded him by the Constitution simply because he was not aware that he possessed such rights." *United States v. Hall, supra* at 845; Collins, *supra*.

In the instant case the court specifically found that defendant was fully and accurately advised of his rights prior to answering any questions. Thus he was clearly aware that he had the right to

refrain from answering questions at any time and to insist at that point on the presence of counsel. The language of the form which the defendant signed has been approved by this court. *State v. McAllister*, 287 N.C. 178, 214 S.E. 2d 75 (1975); *State v. Wright*, 274 N.C. 84, 161 S.E. 2d 581 (1968). We also note that defendant had knowledge of his rights and was aware that the investigation concerned a homicide before he made the incriminating statement. Yet, he willingly continued to answer the questions put to him. The record reveals no point at which he expressed a desire for counsel or a desire to terminate the questioning. An individual in police custody must appraise for himself the import of the questions propounded to him and the significance of his answers to those questions. *United States v. Anderson, supra; People v. MacDonald, supra.*

Finally, we do not rest our holding in this case on mere technical compliance with the requirements of *Miranda*; standing alone that is insufficient, for the test of admissibility of an in-custody statement is whether from a consideration of the entire record it was knowingly, intelligently, and voluntarily made. *State v. White*, 291 N.C. 118, 229 S.E. 2d 152 (1976). We do not hold that the court need not consider the defendant's awareness of the charges about which he is to be questioned in assessing the validity of a waiver of rights. Rather, that factor is one which must be considered in view of the totality of circumstances. *Commonwealth v. Tatro, supra.* The court in this case weighed this factor in light of the other facts in the case and concluded that defendant's lack of knowledge of the charges, standing alone, was not sufficient to invalidate his waiver. The court found that the defendant's statement, even without this information, was voluntarily made. The findings of fact are supported by competent evidence and cannot, therefore, be disturbed on appeal. *State v. White, supra; State v. Childs*, 269 N.C. 307, 152 S.E. 2d 453 (1967), *death sentence vacated*, 403 U.S. 948, 29 L.Ed. 2d 859, 91 S.Ct. 2278 (1971).

In defendant's trial and the judgment appealed from, we find

No error.

Justice BROCK took no part in the consideration or decision of this case.

Justice EXUM dissents.

Justice EXUM dissenting.

The majority sees the issue with respect to the admissibility of defendant's pre-trial statement as being whether a defendant must be informed of the charge under investigation before he can make a knowing and intelligent waiver of his right to counsel and his right to remain silent, recognizing that only a knowing and intelligent waiver will suffice under *Miranda v. Arizona*, 384 U.S. 436 (1966), as a prerequisite to the statement's admissibility. Concluding that no such information is required by *Miranda* or any other authority, the majority finds here that defendant did make the required waivers and holds his statement admissible.

To me the issue presented by these facts is whether an intelligent and knowing waiver can be made when the suspect sought to be questioned is misled by police officers to believe that the crime under investigation is different from and much less serious than the crime which is in fact being investigated. The answer to this issue must surely be "No."

Here on voir dire investigator Simmons testified unequivocally that he "was interviewing [defendant] in relation to a homicide, the murder of Miss Irene Alley of Stewart Drive." Simmons then testified as follows:

"Q. Did you tell him what you wanted to talk to him about?

A. Yes, I asked him did he know why he was there.

Q. And what did he respond?

A. He stated that it was with reference to a possible break-in."

Earlier investigative supervisor Sarvis had testified on voir dire:

"Right at the beginning after I entered the room we explained to Mr. Carter why he was there, what had happened on Stewart Drive. We told him there had been a homicide and a possible break-in. I am fairly certain that I said homicide and a break-in. But I am not really sure. I do not recall whether the word homicide had been mentioned before

that or not. I was not present when the statement was taken by Detective Simmons."

Defendant on voir dire testified that the investigators told him "they were investigating a break-in that had happened over the weekend" and that he, defendant, told Simmons "that they told me when they picked me up that it was for a possible break-in that happened over the weekend." After this conversation between Simmons and defendant, Simmons advised defendant of his rights and took his written waiver. On this voir dire evidence the trial court found as facts:

> "That at police headquarters Mr. Simmons questioned the defendant and asked if he knew why he was there and that he responded that he understood it was in relation to possible breaking and enterings. . . . That at the time of the execution of the waiver the defendant had not been informed that the investigation included a homicide but had been informed that the investigation related to breakings and enterings."

Practically all the evidence in the record supports these findings.

Thus defendant at the time he made his written waiver was led by the officers to believe that they wanted to question him with regard to a breaking when, in fact, they were investigating a homicide. The statement he made exculpates him from any involvement in a breaking but implicates him in a homicide.

I am unwilling to say under these circumstances that defendant made knowing and intelligent waivers when he signed the waiver form. It is understandable why he would have no hesitancy to respond to questions about a possible breaking nor feel the need for counsel if this was the purpose of the inquiry. Not only was he clearly innocent of such an offense, but also it is a felony which carries a maximum punishment of 10 years imprisonment. First degree murder, on the other hand, is punishable by death and, in this case, defendant had knowledge of facts which seriously implicated him in such a crime. Whether defendant was entitled to be informed of the murder investigation before he could make valid waivers is a question upon which courts, as noted in the majority opinion, are divided. Clearly, however, he could not make valid waivers when the investigators had misled him to

believe (1) that the matter to which his waivers would pertain was far less serious than in fact it was and (2) that it was a matter in which he was not at all implicated when in fact it was a matter in which he was seriously involved. In this case the misinformation given defendant by the investigators precluded him from making valid waivers at least until he was correctly informed of the true reason for his interrogation.

The majority relies in part on the fact that defendant was aware that the investigation concerned a homicide "before he made the incriminating statement. Yet, he willingly continued to answer the questions put to him." The majority, however, does not, nor could it under our cases, hold that by merely making statements in response to questions at that point in the interrogation defendant waived his right to counsel. This Court has consistently held "that a defendant's waiver of counsel must be 'specifically made.' In other words, there must be some *positive* indication by the defendant that he does not wish to have an attorney present during the questioning." *State v. Silhan*, 295 N.C. 636, 639, 247 S.E. 2d 902, 904 (1978). (Emphasis original.) "Failure to request counsel is not synonymous with waiver. Nor is silence." *State v. Butler*, 295 N.C. 250, 255, 244 S.E. 2d 410, 413 (1978). The United States Supreme Court said in *Miranda v. Arizona, supra*, 384 U.S. at 470, 475:

> "No effective waiver of the right to counsel during interrogation can be recognized unless specifically made after the warnings we here delineate have been given.
>
>         . . . .
>
> But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained."

Since defendant could not have made a knowing and intelligent waiver of his rights when he signed the written form and did not make a waiver of counsel during the interrogation itself I conclude that his pre-trial statement was not admissible. For this reason I vote for a new trial.