**Andrew Thomas CARTER, Sr.,
Appellant,**

**v.**

**Sam P. GARRISON; Attorney General of
the State of North Carolina, Appellees.**

No. 80–6696.

United States Court of Appeals,
Fourth Circuit.

Argued June 4, 1981.

Decided Aug. 6, 1981.

Rehearing Denied Sept. 15, 1981.

R. Hayes Hofler, III, Durham, N. C., for appellant.

Barry S. McNeill, Associate County Atty. (Rufus L. Edmisten, Atty. Gen. of North Carolina, Richard N. League, Sp. Deputy Atty. Gen., Raleigh, N. C., on brief), for appellees.

Before WINTER, Chief Judge, HAYNSWORTH, Senior Circuit Judge and PHILLIPS, Circuit Judge.

PER CURIAM:

Andrew Carter, under life sentence for first degree murder, appeals the dismissal of his petition for a writ of habeas corpus, 28 U.S.C. § 2254, which claimed that the admission in his state court trial of certain inculpatory statements made by him violated his fifth and sixth amendment rights. We affirm.

While investigating the strangulation death of Irene Alley on September 24, 1977, police officers discovered a receipt book for Allied Exterminators in her driveway on Stewart Drive in Durham, North Carolina. They traced the book to an employee, Carter, who regularly serviced the deceased's residence. At approximately 4:30 p. m. on September 26, three officers went to Allied Exterminators and asked Carter to accompany them to the police station for questioning. The inculpatory statements were made in the course of the interrogation that followed.

Two of the interrogating officers testified at a hearing conducted by the state trial judge on Carter's motion to suppress the statements. Officer Sarvis stated that he never informed Carter why he was to be questioned. Officer Roop testified that he told Carter before the ride and outside the other officers' hearing that the police were investigating an incident at a particular house on Stewart Drive. Officer Roop was present during the interrogation and stated that he further told Carter when the questioning began that there had been a possible break-in and may also have told him there was a homicide.

Detective Simmons, the chief investigator, testified that he met Carter at the station and asked Carter if he knew why he was being questioned. Carter responded that it was with reference to a possible break-in. Simmons then verbally advised Carter of his constitutional rights, showed him the written waiver form which Carter—who is literate—read and which Simmons read to him, and had Carter sign the form. As part of his *Miranda* warnings, Carter was told he had both the right to remain silent and the right to stop answering questions at any time. Carter testified that he had understood everything said to him and had signed the waiver voluntarily.

The interrogation lasted approximately two hours. The police investigators first questioned Carter about a break-in and Carter admitted he had previously serviced Alley's home. After approximately one hour, the investigation shifted to questioning Carter about the homicide and twenty minutes later, he made inculpatory statements that he had been in Alley's house on September 24 and had put his belt around Alley's neck to stop her from screaming.

The trial judge found that when Carter signed the waiver form he had not been informed that the investigation included a homicide, but had learned that it did relate to a break-in. The trial judge then found that Carter was told about the homicide before he made the inculpatory statements, he voluntarily made the statements, and that the officers' failure to advise Carter about the homicide before execution of the waiver did not render the statements inadmissible. Carter was convicted of first degree murder and sentenced to life imprisonment; his conviction was affirmed on appeal. *State v. Carter*, 296 N.C. 344, 250 S.E.2d 263 (1979). Carter then petitioned for habeas corpus relief, contending that he did not knowingly, intelligently, and voluntarily waive his constitutional rights because the police misled him as to the crime they were investigating.

A determination of the validity of a waiver requires an assessment of the totality of the circumstances in each case.

*North Carolina v. Butler,* 441 U.S. 369, 374–75, 99 S.Ct. 1755, 1758, 60 L.Ed.2d 286 (1979); *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). The police have no duty, as part of the *Miranda* warnings, to inform a suspect of the crime which they are investigating. *Miranda v. Arizona,* 384 U.S. 436, 467–79, 86 S.Ct. 1602, 1624–30, 16 L.Ed.2d 694 (1966). Judging the effectiveness of a waiver, however, is not so mechanical. Several courts have expressed doubts that a waiver of the rights to counsel and to remain silent can be knowing, intelligent, and voluntary where the suspect is either totally unaware of or deceived as to the offense under investigation. *United States v. McCrary,* 643 F.2d 323, at 328 (5th Cir. 1981); *Collins v. Brierly,* 492 F.2d 735, 739 (3d Cir. 1974); *Schenk v. Ellsworth,* 293 F.Supp. 26, 29 (D.Mont. 1968). The suspect's ignorance of the exact subject of the interrogation accordingly becomes one part of the court's evaluation of the total circumstances.

■ We hold, assessing the total circumstances, that Carter made an effective waiver. First, interrogation as to a possible break-in and a possible homicide at the same location did not concern unrelated criminal conduct and crimes. *See, e. g., United States v. McCrary,* 643 F.2d 323 (defendant had reason to believe he would be questioned about illegal drugs, not federal firearms violations). Carter knew when he signed the waiver form that he would be questioned about a possible criminal incident that had recently occurred at an identified place where, as it developed, the homicide had occurred. The first hour of interrogation in fact focused on his past presence at Alley's residence. Second, Carter was informed of the homicide twenty minutes before he made the incriminating statements. After the homicide was revealed as the focus of investigation he could have invoked his constitutional rights before answering further questions or at least inquired as to whether his rights continued after the initial waiver. Carter had been instructed that he could stop answering at any time. Third, though technically it may be possible to infer some element of deliberate deceit in the police officers' conduct from the evidence received at the suppression hearing, that evidence is actually ambiguous on the point, and is clearly subject to the conflicting inference of no deliberate deceit. Most significantly, if any deceit was subjectively in play, it could not have misled Carter on the most critical point that the suspected criminal conduct involved a recent intrusion into identified premises. Finally, there was no evidence of force or threat; Carter himself testified that he understood his rights; and the evidence disclosed that he was literate, with a G.E.D. from the U.S. Army, and was not under the influence of alcohol or other drugs during the interrogation.

Accordingly, after examining the totality of the circumstances, we hold that Carter effectively waived his fifth and sixth amendment rights, the statements were admissible, and the magistrate properly dismissed the habeas corpus petition.

*AFFIRMED.*