The **PEOPLE** of the State of Colorado, Petitioner,

v.

John Leroy **SPRING**, Respondent.

John Leroy **SPRING**, Petitioner,

v.

The **PEOPLE** of the State of Colorado, Respondent.

Nos. 83SC145, 83SC155.

Supreme Court of Colorado, En Banc.

Dec. 2, 1985.

As Modified on Denial of Rehearing Jan. 13, 1986.

David F. Vela, Colorado State Public Defender, Margaret L. O'Leary, Seth J. Benezra, Deputy State Public Defenders, Denver, for John Leroy Spring.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Maureen Phelan, Asst. Atty. Gen., Denver, for the People.

LOHR, Justice.

In *People v. Spring,* 671 P.2d 965 (Colo. App.1983), the Colorado Court of Appeals reversed the conviction of defendant John Leroy Spring for first degree murder because it concluded that the trial court erred in denying the defendant's motion to suppress certain statements made by him while in custody during questioning by police officers. We granted the People's petition for certiorari to review this holding. We also granted that part of the defendant's petition for certiorari in which he contends that the trial court committed reversible error by improperly limiting his right to present evidence in his own behalf through defense witnesses, an issue not reached by the court of appeals.[1]

We agree with the court of appeals that the district court erred in denying the defendant's motion to suppress two of the three statements in question, and that a new trial is required as a result, although we do not agree fully with the reasoning of the court of appeals. We also affirm the court of appeals' holding that it was not established whether the third statement was the product of an illegally obtained statement and, therefore, that further proceedings are necessary to resolve the issue of attenuation if the People seek to introduce that statement into evidence at a retrial of Spring. Because certain errors alleged by Spring in his petition for certiorari are likely to arise again upon retrial, we address them in this opinion and conclude that the trial court was unduly restrictive in refusing to admit certain testimony offered by the defendant.

## I.

Defendant John Leroy Spring was charged in Moffat County District Court with the first degree murder of Donald Walker.[2] Evidence presented at trial established that Walker was shot to death during a nighttime elk hunt in early February of 1979 while in the company of Spring and another man, Donald Wagner. The three men had driven to a hunting site near Craig, Colorado. Walker was asked by one of the other men to walk ahead and search a ravine next to the road for elk. Wagner then asked Spring to shine a flashlight in the direction of Walker, whereupon Wagner fired a rifle shot that hit Walker in the head and dropped him to the ground. Wagner then approached the victim and fired a second shot, which resulted in Walker's death. Spring's defense at trial was that he had no knowledge that Wagner was going to shoot and kill Walker and that he assisted Wagner in burying Walker's body in the snow and in further concealing the murder because he was afraid of Wagner. Spring was convicted by a jury of first degree murder and sentenced to life imprisonment, and he appealed.

The court of appeals reversed the conviction, holding that statements made to officers by Spring on March 30, 1979, and July 13, 1979, while he was in custody, were taken in violation of his constitutional rights and that the People had failed to establish that a third statement, made by Spring on May 26, 1979, was not a fruit of the March 30 statement. Specifically, the

1. As one issue in his petition for certiorari, Spring argued that the trial court improperly limited his opening statement, his cross-examination of two prosecution witnesses and his direct examination of defense witnesses. We did not order review of this entire issue; rather, we granted certiorari only to review Spring's assertion that he was improperly prevented from presenting evidence on his own behalf through defense witnesses. Nevertheless, both the People and Spring argued the "opening statement" and "cross-examination" issues in

their briefs. We decline to discuss these issues other than to state that we have reviewed the record and conclude that the district court did not abuse its discretion or commit reversible error with regard to these matters.

2. Spring was charged with that form of first degree murder that is committed "[a]fter deliberation and with the intent to cause the death of a person other than [the actor]." § 18-3-102(1)(a), 8 C.R.S. (1978).

court of appeals held that because Spring was not informed prior to the March 30 and July 13 interviews that the officers were going to question him about Walker's death, Spring's waivers of his right to remain silent and his right to counsel were not intelligent and knowing. With regard to the July 13 statement, the court of appeals also held that the officers improperly continued to question Spring about Walker's death after Spring told them that he did not want to talk about the subject. For these reasons, the court of appeals concluded that the trial court committed reversible error when it refused to grant Spring's motion to suppress the three statements. *People v. Spring,* 671 P.2d at 966–67. We granted the People's petition for certiorari to review these suppression holdings.

The defendant also filed a petition for certiorari, arguing that the trial court committed a variety of errors during his trial in addition to the failure to suppress the challenged statements. We decided to review Spring's assertion that the trial court improperly limited his right to present evidence on his own behalf through defense witnesses. We begin with an examination of the suppression issues.

## II.

Spring made three statements to law enforcement officers while in custody, each one after an advisement of rights and without an attorney present. Two of those statements were admitted into evidence at trial. The statements, and the circumstances surrounding their making, will be described in part B below. A review of the general principles governing the admissibility of statements made by a person in custody will be useful before considering the statements at issue.

**3.** We have held that a trial court must follow a two-step analysis when reviewing a motion to suppress a statement—first determining whether the defendant voluntarily, knowingly and intelligently waived his *Miranda* rights and, if so, then determining whether the statement was made voluntarily. *People v. Fish,* 660 P.2d at 508. The prosecution carries a different burden with respect to each phase of the analysis. *Id.*

### A.

■ The prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates that the defendant was warned adequately of his privilege against self-incrimination and his right to counsel and thereafter voluntarily, knowingly and intelligently waived those rights. *Miranda v. Arizona,* 384 U.S. 436, 444–45, 467–76, 479, 86 S.Ct. 1602, 1612, 1624–1628, 1630, 16 L.Ed.2d 694 (1966); *People v. Lee,* 630 P.2d 583, 588 (Colo.1981). The reason for the warning requirement is that, without such a safeguard, the compelling pressures inherent in police custody "work to undermine the individual's will to resist and to compel him to speak [where] he would not otherwise do so freely." *People v. Lee,* 630 P.2d at 588, *quoting Miranda v. Arizona,* 384 U.S. at 467, 86 S.Ct. at 1624. A consideration separate from the requirement of an advisement of rights and a valid waiver of those rights is that a statement obtained from a defendant is admissible only if made voluntarily. *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); *People v. Thorpe,* 641 P.2d 935, 941 (Colo.1982). A defendant's due process rights are violated if his conviction is founded, in whole or in part, upon an involuntary statement. *People v. Connelly,* 702 P.2d 722, 728 (Colo. 1985). Thus, when reviewing a motion to suppress a statement, and after determining that the statement was preceded by a proper *Miranda* advisement, a court is required to address both the effectiveness of the waiver of *Miranda* rights and the voluntariness of the statement itself. *People v. Pierson,* 670 P.2d 770, 775–76 (Colo. 1983); *People v. Fish,* 660 P.2d 505, 508 (Colo.1983).[3]

We recognize, however, that both steps involve an inquiry into the totality of the circumstances surrounding the making of the statement in an attempt to ascertain the voluntariness of the defendant's actions. For that reason, in many cases the consideration of the two factors may not be neat and distinct. The findings made by the trial court in this case reflect that reality— the court did not analyze each issue separately

First, the trial court must determine whether the defendant voluntarily, knowingly and intelligently waived his right to remain silent and his right to have counsel present. *People v. Pierson*, 670 P.2d at 775; *People v. Fish*, 660 P.2d at 508. "A waiver is valid if it is a knowing and intelligent relinquishment of a known right under the totality of the circumstances which in turn is determined by 'the particular facts and circumstances surrounding [that] case, including the background, experience, and conduct of the accused.'" *People v. Pierson*, 670 P.2d at 775, *quoting Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed.2d 1461 (1938). The burden is on the prosecution to prove by clear and convincing evidence that the defendant waived his constitutional rights. *People v. Fish*, 660 P.2d at 508. *See Miranda v. Arizona*, 384 U.S. at 475, 86 S.Ct. at 1628 (a "heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived" his rights). A valid waiver will not be presumed simply because a statement has been obtained from the defendant. *Miranda v. Arizona*, 384 U.S. at 475, 86 S.Ct. at 1628; *People v. Pierson*, 670 P.2d at 776. "Moreover, any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." *Miranda v. Arizona*, 384 U.S. at 476, 86 S.Ct. at 1629.

If the court determines that the defendant validly waived his constitutional rights, the court must then decide whether the defendant's statement was voluntarily made. *People v. Pierson*, 670 P.2d at 776; *People v. Fish*, 660 P.2d at 508. The burden of proof is on the prosecution to establish by a preponderance of the evidence, considering the totality of the circumstances, that the statement was voluntary. *People v. Cummings*, 706 P.2d 766, 769 (Colo.

1985); *People v. Fish*, 660 P.2d at 508. Statements may not be admitted if they were obtained through promises, threats, violence, or any other improper influence. *People v. Cummings*, 706 P.2d at 769.

Findings of fact made by a trial court as part of its determination concerning the validity of a waiver of rights and the voluntariness of a statement will be upheld on appeal if supported by adequate evidence in the record. *People v. Cummings*, 706 P.2d at 769; *People v. Pierson*, 670 P.2d at 776; *People v. Freeman*, 668 P.2d 1371, 1378 (Colo.1983); *People v. Fish*, 660 P.2d at 509, 510. However, the appellate court may not ignore uncontradicted and credible evidence in the record that is contrary to the trial court's decision. *People v. Freeman*, 668 P.2d at 1378.

With these general principles in mind, we turn next to a description and analysis of the circumstances surrounding the making of the statements by Spring.

### B.

Prior to trial, Spring filed a motion to suppress the relevant statements. After a hearing on March 17, 1980, the trial court issued a written order, which included findings of fact, denying the motion to suppress. The relevant facts concerning each statement that follow come from the trial court's findings of fact, supplemented where necessary by testimony given at the suppression hearing and by other facts in the record.

### 1. *Statement of March 30, 1979.*

Spring was arrested on March 30, 1979, in Kansas City, Missouri, by agents of the federal Bureau of Alcohol, Tobacco and Firearms (ATF) on charges of interstate transportation of stolen firearms and other related offenses. Acting upon information

but rather reviewed the factual circumstances surrounding the making of the statements and made joint conclusions as to the waiver and the voluntariness of each statement. As long as the evidence supports findings by a trial court that a voluntary, knowing and intelligent waiver and a voluntary statement were made by the defend-

ant when viewed in the light of the total circumstances, taking into account the separate burdens placed on the prosecution and the real differences between the two factors, the findings should not be rejected even though the trial court does not cleave the analysis formalistically into two parts.

provided by an informant, George Dennison, the ATF agents had set up an undercover operation to purchase firearms from Spring, and Spring was arrested during this transaction.

Prior to Spring's arrest, the ATF agents also were told by Dennison that Spring had admitted that he and Wagner had killed Walker. At the time the ATF agents received the information from informant Dennison, Walker's body had not been discovered and no report had been made to the police about his disappearance. On March 22, 1979, a week before Spring's arrest, Spring made additional statements inferentially referring to his participation in the killing of Walker in a telephone conversation with Dennison, which was recorded by the ATF agents.

After his arrest, Spring was advised of his *Miranda* rights by an agent on the scene, and was readvised of his rights by another agent after being transported to the ATF office in Kansas City. The second advisement not only included the matters required by *Miranda*—that Spring had a right to remain silent, that any statement he made could be used as evidence against him in court and in other proceedings, that he had the right to consult with and have an attorney present during questioning, and that, if he could not afford an attorney, one would be appointed for him by the courts, *see Miranda v. Arizona*, 384 U.S. at 444, 467–73, 479, 86 S.Ct. at 1612, 1624–1627, 1630—but also included the further advisement that if Spring decided to answer questions without the assistance of an attorney, he had the right to stop the questioning at any time or to stop the questioning until the presence of an attorney could be secured.[4] After being advised of his rights, Spring signed a written form stating that he understood and waived his rights and was willing to make a statement and answer questions.

An interrogation by ATF agents Sadowski and Patterson ensued. It is unclear whether Spring was told by the agents that they wanted to question him specifically about the firearms violations for which he was arrested or whether the agents simply began questioning Spring without making any statement concerning the subject matter of the interrogation. What is clear is that the agents did not tell Spring that they were going to ask him questions about the killing of Walker before Spring made his original decision to waive his *Miranda* rights.

The initial and primary part of the March 30 interrogation concerned the firearms transactions that led to Spring's arrest that afternoon. Agent Patterson testified that he then asked Spring if he had a criminal record. Spring admitted that he had a juvenile murder record stemming from the shooting of his aunt when he was ten years old. Patterson then asked if Spring had ever shot anyone else. "At that time he [Spring] kind of ducked his head and mumbled, 'I shot another guy once.'" Patterson asked Spring if he had ever been to Colorado, and Spring said no. Finally, Patterson asked Spring whether he had shot a man named Walker west of Denver and thrown the body into a snowbank. Patterson testified, "He [Spring]—there was a long pause, then he kind of ducked his head and said no—there was no further comment on it." According to Patterson, the interview ended there.

Concerning this statement, the district court made the following findings:

7. The Court finds that this questioning was conducted while the Defendant was in lawful custody, pursuant to a valid arrest; that Spring had been properly advised of his rights and was aware of his right to remain silent, to have Counsel present during interrogation, to stop the interrogation at any time; and that his responses to the interrogation were

---

**4.** Although these are rights that are guaranteed to the defendant, *see Miranda v. Arizona*, 384 U.S. at 444–45, 473–74, 86 S.Ct. at 1627, *Miranda* did not require that the defendant be advised of these rights, *Miranda v. Arizona*, 384 U.S. at 444, 467–73, 479, 86 S.Ct. at 1612, 1624–1627, 1630; *People in the Interest of M.R.J.*, 633 P.2d 474, 476 (Colo.1981). Even though not required, we commend and encourage the inclusion of this information in any *Miranda* advisement.

made freely, voluntarily and intelligently; that there was no element of duress or coercion used to induce Spring's statements on March 30, 1979.

8. Though it is true that Patterson and Sadowski did not specifically advise Spring that a part of their interrogation would include questions about a Colorado homicide, the questions themselves suggested the topic of inquiry. The questions dealt with "shooting anyone" and specifically killing a man named Walker and throwing his body in a snowbank in Colorado. The questions were not designed to gather information relating to a subject that was not readily evident or apparent to Spring. Spring had been advised of his right to remain silent, his right to stop answering questions, and to have an Attorney present during interrogation. He did not elect to exercise his right to remain silent or to refuse to answer questions relating to the homicide, nor did he request Counsel during interrogation.

9. The Court concludes that the statements made to Patterson and Sadowski on March 30, 1979, should not be suppressed, and may be admitted in evidence.

However, the March 30 statement was never introduced at trial. During trial, the trial court granted the defendant's motion *in limine*, ruling that Spring's statement that he "shot another guy once" was irrelevant and could not be admitted into evidence because the context of the discussion indicated that it did not relate to the Walker homicide. Although the court ruled that the remainder of the statement, including Spring's denial that he killed Walker, was admissible, neither the prosecution nor Spring chose to offer the statement into evidence.

The court of appeals held that it was error not to suppress the statement of March 30. The court first noted that at the time Spring's waiver was obtained, Spring had not been informed by the agents that they were going to question him about the Walker homicide. *People v. Spring*, 671 P.2d at 966. The court of appeals then stated that a knowing and intelligent waiver of *Miranda* rights cannot occur if the defendant is not informed at the time of waiver as to the nature of the crime about which he is going to be questioned, and held:

> The agents had a duty to inform Spring that he was a suspect, or to readvise him of his *Miranda* rights, before questioning him about the murder.... Because the agents failed to so advise, any waiver of rights in regard to questions designed to elicit information about Walker's death was not given knowingly or intelligently.

*Id.* at 966–67 (citations omitted). The court of appeals concluded that Spring's statement is "accordingly rendered inadmissible" and that his conviction must be reversed, *id.* at 967, apparently unaware that this statement had not been admitted into evidence at trial.

■ Although the failure to suppress the March 30 statement cannot be considered reversible error because the statement did not become part of the evidence at trial, whether the statement was obtained in violation of Spring's constitutional rights remains a relevant question. If the statement was illegally obtained, the prosecution must establish that any subsequent statement otherwise properly obtained from Spring and admitted into evidence was not the product of the tainted statement. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *People v. Lee*, 630 P.2d 583, 590 (Colo. 1981); *People v. Lowe*, 200 Colo. 470, 475–76, 616 P.2d 118, 123 (1980).

■ Although we agree that the March 30 statement should have been suppressed, we conclude that the court of appeals adopted and applied an improper legal standard to resolve the admissibility of the statement. As outlined above, the validity of Spring's waiver of constitutional rights must be determined upon an examination of the totality of the circumstances surrounding the making of the statement to determine if the waiver was voluntary,

knowing and intelligent. *People v. Pierson*, 670 P.2d at 775; *People v. Fish*, 660 P.2d at 508. No one factor is always determinative in that analysis. Whether, and to what extent, a suspect has been informed or is aware of the subject matter of the interrogation prior to its commencement is simply one factor in the court's evaluation of the total circumstances, although it may be a major or even a determinative factor in some situations. *Carter v. Garrison*, 656 F.2d 68, 70 (4th Cir.1981) (per curiam); *United States v. McCrary*, 643 F.2d 323, 328–29 (5th Cir.1981); *United States ex rel. Henne v. Fike*, 563 F.2d 809, 813–14 (7th Cir.1977); *Collins v. Brierly*, 492 F.2d 735, 738–40 (3rd Cir.) (en banc) (*and see* at 741–43, Adams, J., dissenting), *cert. denied*, 419 U.S. 877, 95 S.Ct. 140, 42 L.Ed.2d 116 (1974); *State v. Carter*, 296 N.C. 344, 250 S.E.2d 263, 269 (1979); *State v. Goff*, 289 S.E.2d 473, 476–77, 477 n. 8 (W.Va.1982).

> We recognize that
>
> [i]t is difficult to discern how a waiver of these rights could be knowing, intelligent and voluntary where the suspect is totally unaware of the offense upon which the questioning is based.
>
> A valid waiver of constitutional rights does not occur in a vacuum. [A] waiver of the right to counsel and right to remain silent occurs in response to a particular set of facts involving a particular offense. The *Miranda* warnings are given not solely to make the suspect aware of the privilege, but also of the consequences of foregoing the privilege.

*United States v. McCrary*, 643 F.2d at 328–29 (footnotes omitted). It seems likely that a suspect's decision whether to consult with an attorney before answering questions will often be influenced by the seriousness of the matter underlying the interrogation. "It is a far different thing to forgo a lawyer where a traffic offense is involved than to waive counsel where first degree murder is at stake." *Commonwealth v. Collins*, 436 Pa. 114, 259 A.2d 160, 163 (1969) (plurality opinion).

One factor often considered crucial to a court's determination as to the validity of a waiver when faced with facts similar to those presented here is the extent of the suspect's knowledge concerning the likely subjects and scope of the prospective questioning. Thus it is important to determine whether the questions were related to crimes or general subject matter about which the suspect anticipated interrogation, or whether the police led the suspect to believe that he would be questioned about one crime but then interrogated him about a totally unrelated offense. *See, e.g., Carter v. Garrison*, 656 F.2d at 70; *United States v. McCrary*, 643 F.2d at 328–29. In that connection, in the past we have upheld specific waivers because at the time of interrogation the defendants knew "the general nature of the crime involved." The fact that the defendants in those cases had not been informed before interrogation as to the specific crimes with which they were later charged did not render their waivers constitutionally infirm. *People v. Casey*, 185 Colo. 58, 61, 521 P.2d 1250, 1252 (1974); *People v. Weaver*, 179 Colo. 331, 335, 500 P.2d 980, 982–83 (1972). *See also Duncan v. People*, 178 Colo. 314, 318, 497 P.2d 1029, 1031 (1972); *People v. Herrera*, 633 P.2d 1091, 1094 (Colo.App.), *cert. denied* (Colo. 1981); *Commonwealth v. Dixon*, 475 Pa. 17, 379 A.2d 553, 556 (1977); *State v. Goff*, 289 S.E.2d at 477 n. 8.

The federal district court in Montana has adopted an absolute rule that a waiver of *Miranda* rights can never be intelligent, knowing and voluntary when the suspect is not "told of the crime he is suspected of having committed" before questioning begins. *Schenck v. Ellsworth*, 293 F.Supp. 26, 29 (D.Mont.1968). The Pennsylvania Supreme Court adopted a less demanding, but still absolute, rule that "a valid waiver of *Miranda* rights requires that the suspect have an awareness of the general nature of the transaction giving rise to the investigation." *Commonwealth v. Dixon*, 379 A.2d at 556 (footnote omitted). We believe it to be more consistent with standards governing the validity of a waiver to consider the extent of the suspect's understanding of the subject matter, and the source of that understanding, simply as

factors in the totality of circumstances surrounding the making of a statement. We decline to elevate those considerations into an absolute rule that renders any waiver automatically invalid when the interrogated suspect has not been informed of the subject matter of the questioning prior to its commencement.

■ Obviously, a most serious obstacle to the establishment of a voluntary, knowing and intelligent waiver of *Miranda* rights will be presented when the suspect is *totally* unaware of the subject matter of the interrogation at the time he agrees to waive his rights and answer questions. What must be remembered is that an awareness may come from many sources, not only from a direct and explicit statement by the interrogating officers, and that the awareness can vary from a specific knowledge of the crime upon which the questioning will focus to a general understanding of the subject matter in which the interrogators are interested. Thus, an examination of the totality of the circumstances is proper and necessary to determine, among other things, the extent of the suspect's awareness of the subject matter of the investigation and the impact of this awareness, or lack of awareness, on the suspect's decision to waive his constitutional rights.

■ Here, the absence of an advisement to Spring that he would be questioned about the Colorado homicide, and the lack of any basis to conclude that at the time of the execution of the waiver, he reasonably could have expected that the interrogation would extend to that subject, *are* determinative factors in undermining the validity of the waiver. The ATF agents did not advise Spring that a part of their interrogation would include questions about the Colorado homicide prior to Spring's decision to waive his constitutional rights and to answer questions. Spring had no reason to

suspect that the federal agents who had just arrested him in Kansas City during a firearms transaction that allegedly violated federal law would question him about a murder that occurred in Colorado, a crime not only in a distant jurisdiction but also outside of the normal purview of the federal Bureau of Alcohol, Tobacco and Firearms and totally unrelated to the transaction that gave rise to the arrest and interrogation. Moreover, the federal crime that occasioned the interrogation, and about which Spring was cognizant when he signed the written waiver and agreed to answer questions, represented a relatively less serious matter than first degree murder. Although the background and experience of the suspect is a further relevant consideration in determining the validity of any waiver, *People v. Pierson*, 670 P.2d at 775, the record offers little with regard to Spring's intelligence or acquaintance with the criminal justice process, other than the fact that Spring had a criminal record. Given these facts, it cannot be said that the prosecution carried its burden of proving by clear and convincing evidence that Spring made a voluntary, knowing and intelligent decision to forego counsel and to answer questions concerning the murder.[5]

■ The district court concluded that the "questions themselves suggested the topic of inquiry." Certainly, nothing about the questions concerning the federal firearms crimes or about Spring's past criminal record could have suggested to Spring that the topic of inquiry would soon be a Colorado homicide. According to the district court, it is only by the exact questions at issue—whether Spring had killed anyone else, whether he had ever been in Colorado and whether he had shot a man named Walker west of Denver and thrown his body in a snowbank—that Spring became acquainted with the subject of the inquiry. But, the mere fact that a suspect answers questions, without more, does not establish

---

5. A contrast to the other subject matter of the March 30 interview may be instructive. Given the circumstances surrounding Spring's arrest and subsequent interrogation, it could not be argued convincingly that the ATF agents were required to inform Spring explicitly before the interrogation that he would be questioned about the firearm transaction in the parking lot and that any waiver obtained without such an advisement would be invalid.

that a valid waiver has occurred. *Miranda v. Arizona,* 384 U.S. at 475, 86 S.Ct. at 1628. These questions were asked long after Spring had signed the written waiver and agreed to talk to the officers. In the present context, we agree with the Pennsylvania Supreme Court that

"[o]nce an accused has signed the waiver stating that he is willing to give a statement, it is no longer efficacious that he then be told what he is being questioned about. *The compulsive force of the unintelligent waiver has already had its effect."* By this we do not mean to establish a *per se* rule that no post-waiver action taken by the police to inform the defendant of the transaction involved can ever be effective ...; we do hold, however, that a valid waiver will not be found simply because a suspect lacked the presence of mind to halt the interrogation and assert his constitutional rights the moment he was asked a question that revealed the nature of the criminal episode under investigation. Nor is our view in the present case altered by the fact that the police waiver form signed by [the accused] expressly advised the accused that she had the right to call a halt to the questioning. While inclusion of this provision is to be commended, it does little by itself to mitigate the psychological *fait accompli* of the written waiver.

*Commonwealth v. Dixon,* 379 A.2d at 557 (footnote and citation omitted), *quoting Commonwealth v. Collins,* 436 Pa. 114, 259 A.2d 160, 163–64 (1969) (plurality opinion) (emphasis added in *Dixon*).

For these reasons, we conclude that the People did not meet their heavy burden of proving that Spring's answers to questions relevant to the Colorado homicide were made after a voluntary, knowing and intelligent waiver of rights. We agree with the court of appeals that the answers were illegally obtained and that the district court erred by refusing to grant the defendant's motion to suppress the statement of March 30.

### 2. *Statement of May 26, 1979.*

While in jail in Kansas City on May 26, 1979, Spring gave a statement concerning the homicide to Detective Curtis of the Moffat County Sheriff's Department and Agent Konkel of the Colorado Bureau of Investigation. The officers gave Spring a *Miranda* advisement similar in its essentials to the one given by the ATF agents on March 30 and described above, and Spring again executed a written acknowledgment and waiver of his rights. In answer to the officers' questions, Spring acknowledged that he accompanied Wagner and Walker on the elk hunt, that either he or Wagner suggested that Walker go into the ravine to find an elk, that Wagner told Spring to shine his flashlight in the direction of Walker, that Spring was holding the flashlight when Wagner shot Walker, that Spring or Wagner emptied the victim's pockets, that Spring assisted Wagner in dragging Walker's body five or ten feet from where he was killed, and that Spring participated with Wagner in lying about the whereabouts of Walker afterwards. And, according to Detective Curtis, Spring told the officers that he knew or had an idea that something might happen to Walker that night. Spring did not tell Curtis and Konkel that he had no knowledge that Wagner was going to shoot Walker that evening or that his own actions were compelled by his fear of Wagner, as Spring offered in his defense at trial. After the questioning was completed, Spring read, edited and signed a written statement prepared by Konkel and summarizing the interview.

As part of his motion to suppress, Spring argued that the May 26 statement, otherwise the product of a valid advisement and waiver, should be suppressed as the direct fruit of the illegally obtained statement of March 30. Because the district court concluded that the statement of March 30 was not illegally obtained, it did not consider or decide whether the May 26 statement was the fruit of the March 30 statement. The May 26 statement subsequently was received in evidence at trial, and Spring later

echoed, supplemented and explained that statement in his own testimony.

Because of its ruling that the statement of March 30 *was* illegally obtained, the court of appeals held that the People had the burden to prove that the statement obtained from Spring by the Colorado officers on May 26 was not the "fruit of the poisonous tree" of the statement of March 30. *See People v. Lowe*, 200 Colo. at 475–76, 616 P.2d at 123. This burden had not been met. *People v. Spring*, 671 P.2d at 967. If the People sought the admission of the May 26 statement on retrial, "the trial court must first resolve the issue of attenuation from the tainted statement of March 30." *Id.*

■ The People argue that if we agree with the court of appeals that the statement of March 30 was illegally obtained, as we have, then we should decide, on the basis of the record made at the suppression hearing, whether the May 26 statement was the direct fruit of the March 30 statement. We conclude instead that the trial court must resolve the attenuation issue by the application of the appropriate standards to the evidence, *see People v. Briggs*, 709 P.2d 911 (Colo.1985), with leave to hold a supplemental hearing for the presentation of further evidence if deemed necessary by the district court.[6]

### 3. *Statement of July 13, 1979.*

After Spring had been found guilty of the federal firearms violations, ATF agents Patterson and Wactor interviewed Spring on July 13, 1979, in the Jackson County Jail. The trial court found that the primary purpose for conducting this interview, a purpose apparently made known to Spring at the outset, was to obtain information from him concerning the whereabouts of additional firearms and explosives. When the interview began, Spring was not told that he would be questioned about the Walker homicide.

Spring again was advised of his rights in an advisement identical to the one he received before his interrogation on March 30. Spring acknowledged that he understood his rights, but declined to sign any form without consulting an attorney. The agents got up to leave, whereupon Spring stated that he would talk to the agents without an attorney being present; however, he would not sign the written acknowledgment and waiver form. On that basis, the agents resumed the interview.

The interrogation apparently began with a wide-ranging discussion of the whereabouts of various firearms and explosives of which Spring might be aware, along with related subjects. As part of this discussion, Spring was asked where he had obtained a .22 caliber pistol that the agents had seized from him at the time of his arrest. Spring replied that it had been Walker's gun. Asked if he took the gun off Walker's body, Spring said, "I'd rather not talk about that." Later, the agents asked Spring if he had shot Walker and, subsequently, if Wagner had shot Walker. To both questions, Spring again replied, "I'd rather not talk about that." At some point in the interview, Spring was willing to state that he had been in Colorado in 1979 and that he, Wagner and Walker had been riding around together. According to Agent Wactor, Spring also stated that "prior to Mr. Walker's going down into the ravine that he had obtained the .22 caliber pistol from Mr. Walker" and, in another portion of Wactor's testimony, that "[Spring] did admit to getting Walker's gun away from him before he went to flush deer out of [the] ravine." Agent Wactor also asked Spring, "Is it safe to assume that you, Wagner and Walker went out together and that only you and Wagner came back alive?" Spring replied, "Yeah, you could say that." According to the agents, Spring either grinned or laughed while saying this.

6. In their petition for rehearing, the People for the first time raise the argument that *Oregon v. Elstad*, —— U.S. ——, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), makes the statement of May 26, 1979, admissible without regard to attenuation. We elect not to address this issue, but the People are free to assert this argument to the trial court in further proceedings on remand.

The record contains no recording or transcript of the July 13 interrogation. Only Agent Wactor's brief, handwritten notes were placed into evidence. It is not clear in what sequence the questions concerning the Walker homicide were asked and answered, or not answered, and at what points in the interview these questions were asked. Nor can we tell with any certainty what unrelated questions, if any, were asked in between questions concerning the killing of Walker. Both agents testified that whenever Spring stated that he did not want to talk about some aspect of the Walker murder, the subject was changed to a separate topic. Agent Wactor testified that the questions about the killing of Walker were not interspersed with questions about wholly unrelated matters; Agent Patterson gave contrary evidence that general conversation about matters unrelated to the Walker homicide occurred between questions about Walker's death.

The district court declined to suppress the July 13 statement. As part of its findings, the court stated, "Spring did understand that he had the right not to answer questions, and exercised that right with respect to several specific questions." The court again rejected Spring's argument that the waiver was not valid because he was not advised prior to the interview that he would be questioned about the homicide. The court concluded that the questions concerning the homicide were not "ruse questions" designed to trick an unwary person and noted that at the time of the interview, Spring had already talked with the Colorado authorities about the murder and that an information and warrant charging Spring with Walker's murder had been issued. Through the testimony of the agents, portions of the July 13 statement subsequently were received in evidence at trial.

The court of appeals held that the trial court committed reversible error in admitting the statement of July 13, 1979, for two reasons. First, the court of appeals noted that "when the agents began asking about the homicide, Spring answered, 'I'd rather not talk about that.' The agents shifted the interview to other topics, but returned again to the homicide. This process was repeated until the agents obtained an incriminating response." *People v. Spring,* 671 P.2d at 967. The court of appeals noted also that "[o]fficers who meet with a refusal to make any statement during an attempted in-custody interrogation are not permitted periodically to repeat the procedure until the accused finally makes a statement. *Dyett v. People,* 177 Colo. 370, 494 P.2d 94 (1972)." *Id.* For that reason, the court concluded that Spring exercised his right to silence as to matters concerning the homicide, and the officers violated that right by continuing to question Spring and obtaining a statement. Second, the court again held that Spring was entitled to renewed *Miranda* warnings when the agents began to question him about the murder, which was a topic not related to their stated purpose for the interview. *People v. Spring,* 671 P.2d at 967.

■ We conclude that the statement should have been suppressed, although we do not agree with all of the reasons given by the court of appeals. In particular, for the reasons discussed above, we do not approve of the court of appeals' adoption of a *per se* rule rendering invalid any waiver of *Miranda* rights when the defendant answers questions, without a renewed *Miranda* advisement, on a subject about which he was not informed before the interrogation. We conclude, however, that the evidence in the record, when viewed in the light of the totality of the circumstances and the requirements of *Miranda v. Arizona,* does not support the trial court's finding that Spring's July 13 statement was the result of a valid waiver of constitutional rights.

In *Miranda v. Arizona,* the United States Supreme Court stated that the procedure to be followed after a *Miranda* advisement is clear. "If the individual indicates in any manner, at any time prior to *or during questioning,* that he wishes to remain silent, the interrogation must cease."

384 U.S. at 473–74, 86 S.Ct. at 1627 (footnote omitted; emphasis added). We recognize that an individual might refuse to answer certain questions yet voluntarily and intelligently decide to answer others during the course of a single interrogation, and a waiver established under such circumstances may be valid and effective. However, it must not be forgotten that the government carries a "heavy burden" to demonstrate that the waiver is voluntary. *Miranda v. Arizona*, 384 U.S. at 475, 86 S.Ct. at 1628. *See also People v. Fish*, 660 P.2d at 508. Once the defendant has indicated in any way that he does not wish to answer a question or questions, the interrogating officers have an affirmative and emphatic duty to determine whether the suspect is in fact exercising his privilege against self-incrimination in all respects or is merely reluctant to answer particular questions. *See People v. Lowe*, 200 Colo. at 477, 616 P.2d at 123–24; *Dyett v. People*, 177 Colo. at 372–73, 494 P.2d at 95. Simply continuing the interrogation along similar or even unrelated lines rarely will satisfy the requirements of *Miranda*. And the fact that a statement is eventually made by the defendant is not determinative. "[A] valid waiver will not be presumed ... simply from the fact that a confession was in fact eventually obtained." *Miranda v. Arizona*, 384 U.S. at 475, 86 S.Ct. at 1628; *People v. Pierson*, 670 P.2d at 776.

■ Here, there is no evidence that the ATF agents made any effort to reaffirm Spring's decision to waive his constitutional rights after he declined to answer particular questions. Nor did they make any effort to establish that by refusing to answer certain questions about the shooting of Walker, Spring did not intend to exercise his privilege against self-incrimination with regard to the entire subject from that point forward. They simply continued to interrogate Spring until they received answers to questions about the Walker homicide. Without a transcript or equivalent evidence showing the sequence and wording of the questions asked and Spring's answers, we cannot say that the evidence supports the district court's finding that Spring only exercised his right to remain silent "with respect to several specific questions," and that the waiver remained valid with respect to all of his answers to the other questions.

For this reason alone, the record does not support the trial court's finding that the prosecution met its burden of proving by clear and convincing evidence that the defendant knowingly, intelligently and voluntarily waived his constitutional rights to remain silent and to have counsel present when he uttered the July .13 statement. We agree with the court of appeals that the trial court erred in failing to suppress this statement.

■ The People have not argued that the admission of this statement was harmless error, and it obviously cannot be considered harmless under the circumstances. Before a constitutional error can be considered harmless, a court must be satisfied beyond a reasonable doubt that the error did not affect the jury's ultimate resolution of the case. *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *LeMasters v. People*, 678 P.2d 538, 538–39, 544 (Colo.1984). The matters contained in the statement of July 13 were generally cumulative of other evidence, assuming, for this purpose, that the May 26 statement was properly admitted.[7] However, the admission at trial of the particular statement from Spring concerning Walker's gun, a fact added by the July 13 statement, was clearly prejudicial to Spring. At trial, both Agent Wactor and Agent Patterson testified that Spring said he talked Walker into leaving his firearm behind in the van before Walker went towards the ravine. A jury might infer from this evidence the necessary premeditation on the part of Spring on the grounds that Spring intentionally disarmed Walker so that Walker could not protect himself. As Spring's pri-

---

7. As previously noted, however, the admissibility of the May 26 statement is dependent upon the determination of an attenuation issue. *See* Part II B 2, above.

mary defense at trial was that he had no knowledge that Wagner was going to shoot Walker that evening, this added fact, although circumstantial, cannot be considered harmless.

Accordingly, the admission of the July 13 statement constitutes reversible error, and Spring's conviction must be reversed for that reason. A new trial is required, and, as the court of appeals ordered, the trial court must resolve the issue of attenuation if the People seek the introduction of the May 26 statement on retrial.

### III.

Spring argues that the trial court prevented him from telling his side of the story to the jury. The scope of the direct examination of witnesses, including witnesses for the defense, is generally a matter within the sound discretion of the trial court. *People v. Reynolds*, 194 Colo. 543, 547, 575 P.2d 1286, 1290 (1978). However, an abuse of discretion by a trial court in restricting the direct examination of defense witnesses may compel the reversal of a conviction. *Id.* We conclude that the trial court unduly restricted Spring's own testimony, although it is not necessary for us to determine whether reversible error occurred given our holding in part II. Because the errors are likely to occur again upon a retrial of Spring, we elect to address these evidentiary questions briefly in this opinion.[8]

The first ruling objected to occurred when Spring sought to explain why he and Wagner invited Walker to accompany them on the elk hunt. According to Spring, Wagner and he went hunting and shot a deer the night before, and Spring related this to Walker. The trial court would not allow Spring to testify that Walker responded by being upset about their failure to invite him along and that, because Walker was upset, Spring and Wagner included him in their plans to go elk hunting the

next night. The trial court also refused to allow Spring to testify as to statements made by Wagner and by Mike Knez, a friend of Spring and Wagner, that were made on the day of the shooting and also concerned the plans for the elk hunt. The trial court excluded these statements, concluding:

> The danger—the risk here as I perceive it, Mr. Bratfisch [Spring's attorney], is that through this witness and his own statements concerning what was said in conversations of other people, he is in essence stating not what is happening in his mind but creating conversations which he—or discussing conversations which tend to have—indicate that there was a corroborative effect from other persons as to whatever may have been in his mind and I think this is possibly misleading and I think it's clearly hearsay and shouldn't come in for that purpose. I think the witness is entitled to say what his—was in his mind at that time. But I don't think he's entitled to try to corroborate it by embellishing upon particular conversations that occurred which are hearsay and would constitute hearsay evidence.

Spring argues that these statements were relevant and were not hearsay, as their admission was not sought to prove the truth of the matters asserted but to explain Spring's state of mind, i.e., his innocent motive in participating in the elk hunt.

The defendant is correct. Out-of-court statements offered not to prove the truth of the matter asserted but offered because they tend to explain the state of mind of someone other than the declarant are not hearsay and should be admitted if relevant. *See* CRE 801(c) (definition of "hearsay"); *People v. Burress*, 183 Colo. 146, 150–54, 515 P.2d 460, 462–64 (1973). Also, the defendant is entitled to present evidence corroborating his own testimony about his actions and mental state. *See People v. Green*, 38 Colo.App. 165, 167,

---

**8.** Spring also argues that the trial court improperly limited his examination of two other defense witnesses, Michael Kopp and Becky Spring. After reviewing the record, we conclude that each of the matters challenged either is not likely to recur in a new trial or that the district court did not err, and we decline to discuss these matters further.

553 P.2d 839, 840 (1976). The fact that the corroborative evidence in this instance also was in the form of testimony by the defendant is simply a factor for the jury to consider in deciding what weight to give to that corroboration. The trial court should not exclude this evidence if properly presented on retrial.

 Similarly, Spring argues that the district court would not allow him to testify as to what Wagner said to Spring, or to others in Spring's hearing, that compelled Spring to assist Wagner in concealing the murder and to refrain from telling the complete story when first interviewed by law enforcement officials. Without going into detail about the merits of individual rulings, we conclude that evidence of this type is relevant and should be admitted on retrial if presented by the defendant in proper form.

## IV.

For the reasons given, the judgment of the court of appeals is affirmed, and the case is remanded to that court to be returned to the trial court for further proceedings consistent with this opinion.

ERICKSON, J., dissents in part and concurs in part.

ROVIRA, J., joins in the dissent and concurrence.

KIRSHBAUM, J., does not participate.

ERICKSON, Justice, dissenting in part and concurring in part:

I respectfully dissent to part II of the majority opinion. The court of appeals held that a suspect cannot voluntarily waive his *Miranda* rights unless he is informed of the crime about which he is to be questioned. *People v. Spring*, 671 P.2d 965 (Colo.App.1983). The majority rejects the absolute rule adopted by the court of appeals and holds that a suspect's knowledge of the crime is only one factor to be considered in determining the validity of the waiver. In this case, however, the court concludes that the failure of the federal agents to inform Spring that he was a suspect in the Walker homicide is a sufficient basis for holding his waiver of *Miranda* rights on March 30, 1979 invalid. I disagree.

Law enforcement officers have no duty under *Miranda* to inform a person in custody of all charges being investigated prior to questioning him. *Carter v. Garrison,* 656 F.2d 68, 70 (4th Cir.1981) (per curiam), *cert. denied,* 455 U.S. 952, 102 S.Ct. 1458, 71 L.Ed.2d 668 (1982); *State v. Carter,* 296 N.C. 344, 250 S.E.2d 263, 268, *cert. denied,* 441 U.S. 964, 99 S.Ct. 2413, 60 L.Ed.2d 1070 (1979); W. LaFave & J. Israel, *Criminal Procedure* 306 (1985). All that *Miranda* requires is that the suspect be advised that he has the right to remain silent, that anything he says can and will be used against him in court, that he has the right to consult with a lawyer and to have the lawyer present during interrogation, and that if he cannot afford a lawyer one will be appointed to represent him. *Miranda v. Arizona,* 384 U.S. 436, 467–79, 86 S.Ct. 1602, 1624–1630 (1966). As one court has stated:

We have serious reservations about an interpretation of *Miranda v. Arizona* ... which would require that before custodial interrogation begins, in addition to the mandated declarations, a statement must be made by the police as to the nature of the crime under investigation. That landmark decision was painstakingly specific in listing the basic constitutional rights which the police must propound to a suspect before he is questioned. Nowhere is there the slightest indication that there must be included a warning about the nature of the crime which has led to the interrogation conference, what the penalty is for the offense, what the elements of the offense consist of, and similar matters.... In a sense, all of these elements might conceivably enter into an "intelligent and understanding" rejection of an offer for the assistance of counsel, but the simple answer is that *Miranda* does not by its terms go so far. It requires that the accused be advised of his rights so that

he may make a rational decision, not necessarily the best one or one that would be reached only after long and painstaking deliberation. Indeed, it may be argued forcefully that a choice by a defendant to forego the presence of counsel at police interrogation is almost invariably an unintelligent course of action. It is not in the sense of shrewdness that *Miranda* speaks of "intelligent" waiver but rather in the tenor that the individual must know of his available options before deciding what he thinks best suits his particular situation. In this context intelligence is not equated with wisdom.

*Collins v. Bierly*, 492 F.2d 735, 738-39 (3rd Cir.), *cert. denied*, 419 U.S. 877, 95 S.Ct. 140, 42 L.Ed.2d 116 (1974) (footnote and citation omitted).

Here, Spring was advised twice of his *Miranda* rights before he was questioned on March 30, 1985—first at the time of his arrest and then immediately before the interrogation. Spring was also informed that he had the right to stop the questioning at any time. Thus, the warnings given to Spring exceeded the requirements of *Miranda*.

In concluding that Spring validly waived his *Miranda* rights on March 30, 1979, the trial court properly considered the totality of the circumstances under which the waiver was made. *North Carolina v. Butler*, 441 U.S. 369, 374-75, 99 S.Ct. 1755, 1758, 60 L.Ed.2d 286 (1979); *People v. Pierson*, 670 P.2d 770, 775 (Colo.1983). The court found that Spring "was aware of his right to remain silent, to have counsel present during interrogation, to stop the interrogation at any time; and that his responses were made freely, voluntarily and intelligently." The trial court's findings should not be disturbed on appeal if supported by adequate evidence in the record. *Pierson*, 670 P.2d at 770, 776.

Here, there is ample evidence to support the trial court's conclusion that Spring waived his *Miranda* rights. Prior to any questioning, Spring signed a written acknowledgment and waiver of his rights to

remain silent and to have counsel present. Such an express waiver is strong proof of its validity. *North Carolina v. Butler*, 441 U.S. at 373, 99 S.Ct. at 1757. Additionally, nothing in the record suggests that Spring did not understand the warnings given to him, the nature of his fifth amendment rights, and the consequences of waiving those rights. *Fare v. Michael C.*, 442 U.S. 707, 726, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979). He was a convicted felon who had considerable experience with the police. He was not "worn down by improper interrogation tactics or lengthy questioning or by trickery or deceit." *Id.* at 727, 99 S.Ct. at 2573.

The majority nonetheless rejects the findings of the trial court on the sole ground that Spring was not advised that he would be questioned about the Walker homicide. In my view, a waiver of *Miranda* rights should never be held invalid simply because the suspect is not informed or does not know in advance of all matters that are under investigation and will be the subject of interrogation. The effect of the majority opinion is to add to the *Miranda* warnings the requirement that the police disclose all possible crimes that might be the subject of interrogation. The practical difficulties of satisfying this requirement are obvious. Prior to questioning a suspect, the police may have insufficient information to determine what charges will ultimately be filed against him. The nature of the offense may depend upon circumstances unknown to the police, such as whether the suspect has a criminal record. It may also turn upon an event yet to occur, such as whether the victim of the crime dies. Therefore, I reject the majority's conclusion that Spring's waiver of his *Miranda* rights on March 30, 1979 was invalid simply because he was not informed of all matters that would be reviewed when he was questioned by the police.

I would also uphold the trial court's refusal to suppress the statements made by Spring to Colorado law enforcement officers on May 26, 1979. When Spring was told that the Colorado authorities wished to

speak with him, he readily agreed to do so. The officers orally advised Spring of his *Miranda* rights, and he then signed a written acknowledgment and waiver form. Spring told the officers that he agreed to talk to them about the Walker homicide because he "wanted to get it off his chest." The interview was conducted in the day room of the jail and lasted only one hour and thirty minutes. Spring talked freely to the officers about his participation in the Walker homicide. At no time did he refuse to answer questions or request the presence of counsel. Nothing in the record indicates that the officers conducted the interview in a coercive manner. At the conclusion of the interview, Spring read, edited, and signed a written statement prepared by one of the officers summarizing the interview. In my view, the trial court correctly found that the statement given by Spring was made freely, voluntarily, and intelligently, after a proper *Miranda* advisement and waiver.

Finally, I agree with the majority that the trial court erred in not suppressing the statement made by Spring on July 13, 1979. In light of Spring's refusal to answer certain questions regarding the Walker shooting, the agents should have then determined if Walker sought to invoke his right against self-incrimination on that subject. Their failure to do so renders Spring's purported waiver of his *Miranda* rights invalid.

I am authorized to say that Justice ROVIRA joins me in this dissent and concurrence.